Michael CHANDLER, et al., Plaintiffs,

v.

Fob JAMES, et al., Defendants.

No. CV 96–D–169–N.

United States District Court,
M.D. Alabama,
Northern Division.

Dec. 17, 1997.

Steven Green, Americans United for Separation of Church and State, Washington, DC, Stephen L. Pevar, American Civ. Liberties Union, Denver, CO, Elizabeth Joy Hubertz, Levin, Middlebrooks, Mabie, Thomas, Mitchell, Papantonio & Lamb, Birmingham, AL, James A. Tucker, Alabama Civ. Liberties Union, Montgomery, AL, Pamela L. Sumners, Birmingham, AL, for Plaintiffs.

Jere L. Beasley, James A. Main, P. Leigh O'Dell, Beasley, Wilson, Allen, Main & Crow, P.C., Montgomery, AL, Alan Eric Johnston, Johnston, Trippe & Brown, Birmingham, AL, William P. Gray, Jr., Legal Advisor to the Governor, Governor's Office, Montgomery, AL, for Fob James, Jr.

William H. Pryor, Jr., Atty. Gen., Thomas F. Parker, IV, Deputy Atty. Gen., Office of Atty. Gen., Montgomery, AL, Jay A. Sekulow, American Center for Law and Justice, Mobile, AL, for Jeff Sessions.

Denise Boone Azar, Michael R. White, Dept. of Educ., Office of General Counsel, Montgomery, AL, Ashley H. Hamlett, Alabama Dept. of Public Health, Montgomery, AL, for Dr. Ed Richardson.

Denise Boone Azar, Larry E. Craven, Dept. of Educ., Office of Gen Counsel, Montgomery, AL, Ashley Hamlett, Alabama Dept. of Public Health, Montgomery, AL, for Bradley Byrne, G.J. Higginbotham, Stephanie Bell, Ethel Hall, Dr. Willie Paul, David Byers, Jr., Sandra Ray, Dr. Mary Jane Caylor.

Donald B. Sweeney, Jr., David P. Condon, Valerie T. Kisor, Rives & Peterson, Birmingham, Al, Oakley W. Melton, Jr., James Eugene Williams, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, Robert B. French, Jr., Fort Payne, AL, for Weldon Parrish, Jimmy Wilbanks, Johnny Young, Mary Etta Bailey, Willard A. Israel, Tommie Johnson.

Mark A. Rasco, Ralph Gaines, Gaines, Gaines & Rasco, P.C., Talladega, AL, J. Allen Schreiber, Gerald Alan Templeton, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, James Eugene Williams, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, for Charles E. Kearley, James Braswell, T.Y. Lawrence, Jr., Bonnie Miller, Michael O'Brien, Helen Scales.

## ORDER

DE MENT, District Judge.

Before the court is a "Motion For Partial Stay Of Permanent Injunction" ("Defs.' Mot.") filed on November 10, 1997 by the Attorney General of the State of Alabama, the Alabama State Board of Education and its individual members, and the DeKalb County, Alabama, Board of Education and its individual members ("Defendants"). Defendants filed a "Memorandum In Support" ("Defs.' Mem. In Supp.") on the same date. Plaintiffs filed their "Opposition To 'Defendants' Motion To Stay'" ("Pls.' Opp'n") on November 18, 1997 to which Defendants filed a Reply ("Defs.' Reply") on November 24, 1997. On the same date, Plaintiffs filed their "Supplemental Opposition To 'Defendants' Motion To Stay'" ("Pls.' Supplemental Opp'n"), and the "Declaration Of Susan Jane Neely In Opposition To 'Defendants' Motion To Stay' Injunction" ("Neely Decl."). On December 5, 1997, Plaintiffs filed their "Reply To '[Defendants'] Reply to Plaintiffs' Opposition To Defendants' Motion For Partial Stay,'" ("Pls.' Reply"), and the Declaration of John Woodfin ("Woodfin Decl.").[1] On December 4, 1997, counsel for the DeKalb County Board of Education and its Superintendent, filed a "Report to Court of Counsel of DeKalb County Board of Education, et al." ("DeKalb Sch. Bd. Report To Ct.") On December 15, 1997, Plaintiffs filed their "Additional Evidence In Opposition To Defendants' Motion For Stay." ("Pls.' Add. Evid.").

Defendants move the court, pursuant to Rule 62 of the Federal Rules of Civil Procedure, for a stay of sections 6(a), 6(b), 6(c), 6(d), 6(e) and 7 of the court's October 29, 1997 Permanent Injunction ("Permanent Inj."), pending review by the Eleventh Circuit Court of Appeals. (Defs.' Mot. at 1.) Defendants contend that these sections of the Permanent Injunction are "vague and overbroad." (Defs.' Mem. In Supp. at 1.) Plaintiffs argue that the "proscriptions are all

---

1. Woodfin's Declaration was originally filed in handwritten form as Exhibit B to Plaintiffs' Supplemental Opposition filed November 24, 1997. The December 5, 1997 filing was typed and formally executed.

specific and under the totality of the circumstances give ... an extremely clear understanding of the conduct that is proscribed." (Pls.' Opp'n at 7.) After careful consideration of the arguments of counsel, as well as relevant law, the court finds that Defendants' "Motion For Partial Stay Of Permanent Injunction" is due to be granted as to twelve words of the court's three-thousand, seven-hundred and fourteen word Permanent Injunction, and otherwise denied.

## DISCUSSION

On March 12, 1997, the court issued a Memorandum Opinion and Order finding unconstitutional Alabama Code Section 16–1–20.3, Alabama's fourth incantation of a "school prayer" statute. *Chandler v. James,* 958 F.Supp. 1550, 1568 (M.D.Ala.1997). The challenge to the statute arose in the context of officially initiated, promoted and/or sanctioned religious activity that was occurring in the public schools of DeKalb County, Alabama. On October 29, 1997, the court issued a Permanent Injunction enjoining various state and local officials from enforcing Alabama Code Section 16–1–20.3. (*See* Permanent Inj. at 1–3.) The Permanent Injunction also prohibited a variety of officially initiated, promoted and/or sanctioned activities that the court found to be in violation of the First Amendment.[2] (*Id.* at 3–12.) Provisions were made to ensure compliance and to protect the rights of those citizens who were subject to the activity found unconstitutional. (*Id.* at 3–16.) In the Motion To Stay currently before the court, Defendants do not challenge those portions of the Permanent Injunction prohibiting enforcement of Alabama Code Section 16–1–20.3; their challenge is limited to specific sections of the Permanent Injunction applicable to DeKalb County, Alabama.[3]

For purposes of clarity, and in order to rectify convoluted interpretations of the terms of the court's Permanent Injunction, the court will: (1) state the applicable law; (2) restate the specific provisions of the Permanent Injunction that are at issue; (3) summarize the arguments of counsel; and (4) analyze the arguments of counsel in light of applicable law and the terms of the Permanent Injunction.

## I. APPLICABLE LAW

### A. Standard Of Review

Rule 62(c) of the Federal Rules of Civil Procedure provides that "the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party." Fed. R.Civ.P. 62(c). In *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), the Supreme Court stated that:

> Different Rules of Procedure govern the power of district courts and courts of appeal to stay an order pending appeal. *See* Fed.Rule Civ.Proc. [sic] 62(c); Fed.Rule App.Proc. [sic] 8(a). Under both Rules, however, the factors regulating the issuance of a stay are generally the same: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton,* 107 S.Ct. at 2119 (citations omitted).[4] These factors "contemplate individualized judgment in each case, [and] the formula cannot be reduced to a set of rigid rules." *Id.*

Defendants urge the court to also consider their Motion under what they describe as the

---

**2.** In addition to the March 1997 Memorandum Opinion and Order, the court's findings were articulated in its November 1997 Supplemental Opinion and Order and November 1997 Memorandum Opinion and Order.

**3.** The Defendants, speaking through the Attorney General, stated that they are "not challenging this Court's March 12, 1997 Memorandum Opinion, the factual record in this matter, or thirty

years of controlling legal precedent.... For purposes of Defendants' Motion For Partial Stay, the Attorney General is only challenging certain provisions of this Court's October 29, 1997 Permanent Injunction." (Defs.' Reply at 2.)

**4.** The parties agree that these factors guide the court's analysis in assessing a request for a stay. (*See* Defs.' Mem. In Supp. at 3; Pls.' Opp'n at 5–6.)

"alternate standard" outlined by the Eleventh Circuit in *Garcia–Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir.1986). (Defs.' Mem. In Supp. at 3.) There, the Eleventh Circuit, as quoted by the Defendants, stated that "[o]rdinarily the first factor is the most important ... [b]ut the movant may also have his motion granted upon a lesser showing of a substantial case on the merits when the balance of equities [identified in factors 2, 3, and 4] weighs heavily in favor of granting the stay." (Defs.' Mem. In Supp. at 3 (citing *Garcia–Mir*, 781 F.2d at 1453).) Defendants argue that they are "not only likely to prevail on appeal, but the last three factors weigh heavily in favor of granting the stay. Therefore, the movants are entitled to prevail under the Eleventh Circuit's alternate standard." (*Id.*)

As an initial matter, the court notes that in *Garcia–Mir*, the Eleventh Circuit addressed an "emergency motion to stay" filed in the court of appeals, rather than in the district court in which the action originated. *Garcia–Mir*, 781 F.2d at 1451, 1453; *see also, United States v. Bogle*, 855 F.2d 707 (11th Cir.1988) (applying factors articulated in *Garcia–Mir* in context of emergency appeal before the Eleventh Circuit and citing to Eleventh Circuit Rule 27–1(b)).[5] The Eleventh Circuit specifically noted the "emergency" nature of the motion to stay at issue there, and noted the "extraordinarily high standards of review of motions for emergency stays." *Id.* at 1451, 1454. In contrast, the Motion To Stay at issue in this action was filed with *this* court, a United States District Court, not the Eleventh Circuit Court of Appeals, and is in a non-emergency posture.

Utilization of the four *Hilton* factors in an "emergency" context ordinarily entails analysis of substantially more compelling factual and legal circumstances than in ordinary motions to stay. Predictably, that is why provisions are made for "emergency" motions, and why the factors may be entitled to different weight in that context. In an "emergency" appellate proceeding, emphasis may be placed on the likelihood of success on the merits, in part because the appellate court must determine that the trial court below was "clearly erroneous." *Garcia–Mir*, 781 F.2d at 1453. Once this determination is made, the likelihood of reversal on appeal may justify granting a stay, regardless of the other three factors. That is also why a showing of a "substantial case on the merits" coupled with the other three factors weighing heavily in favor of the movant may justify a stay. *See Garcia–Mir*, 781 F.2d at 1453. Hence, emphasis on the first factor, in those contexts, is warranted.

Tellingly, in *Hilton*, the Supreme Court was not addressing the standards utilized in "emergency" appellate proceedings, or "emergency" district court proceedings for that matter, and made no mention of applying heightened deference to the first *Hilton* factor in district court proceedings. *Hilton*, 481 U.S. at 776–77. The Court was careful to note, however, that "individualized judgments" must be made in each case, and that

---

5. Eleventh Circuit Rule 27–1(b) provides:

(b) Emergency Motions.

(1) A party requesting emergency action shall label the motion as "Emergency Motion" and state the nature of the emergency and the date by which action is necessary. The motion or accompanying memorandum shall state the reasons for granting the requested relief and must specifically discuss: ·

(i) the likelihood the moving party will prevail on the merits;

(ii) the prospect of irreparable injury to the moving party if relief is withheld;

(iii) the possibility of harm to other parties if relief is granted; and

(iv) the public interest.

Counsel filing the motion shall make every possible effort to serve the motion personally; if this is not possible, counsel shall notify opposing counsel promptly by telephone.

(2) If the emergency motion raises any issue theretofore raised in a district court, counsel for the moving party shall furnish copies of all pleadings, briefs, memoranda or other papers filed in the district court supporting or opposing the position taken by the moving party in the motion and copies of any order or memorandum decision of the district court relating thereto. If compliance is impossible or impractical due to time restraints or otherwise, the reason for non-compliance shall be stated.

(3) An emergency motion, whether addressed to the court or an individual judge, ordinarily should be filed with the clerk and not with an individual judge. To expedite consideration by the court in a genuine emergency, counsel may telephone the clerk and describe a motion that has not yet been filed in writing. This is not a substitute for the filing required by FRAP 27(a).

"the formula cannot be reduced to a set of rigid rules." *Id.* at 776.

 Not only do Defendants conveniently fail to note the emergency, appellate, posture of *Garcia–Mir*, as opposed to the non-emergency posture of the Motion To Stay currently in this court, they also fail to cite the entirety of the Eleventh Circuit's relevant language in *Garcia–Mir* (the language quoted by Defendants is italicized):

> We must always be diffident in interposing the power of an appellate court into the province of the trial court and its orders save upon full briefing and mature reflection by this Court. The grant of an emergency motion to stay the trial court's mandate is thus an exceptional response granted only upon a showing of four factors: 1) that the movant is likely to prevail on the merits on appeal; 2) that absent a stay the movant will suffer irreparable damage; 3) that the adverse party will suffer no substantial harm from the issuance of the stay; and 4) that the public interest will be served by issuing the stay.
>
> *Ordinarily the first factor is the most important.* A finding that the movant demonstrates a probable likelihood of success on the merits on appeal requires that we determine that the trial court below was clearly erroneous. But the movant may also have his motion granted upon a lesser showing of a "substantial case on the merits" when the balance of the equities [identified in factors 2, 3, and 4] weighs heavily in favor of granting the stay.

*Garcia–Mir*, 781 F.2d at 1453 (citations omitted). The emphasis placed on the first factor was clearly done in the context of an "emergency" appellate review of a district court order. Use of the *Garcia–Mir* standard by a district court would essentially require the court to determine that it was clearly erroneous in issuing a staying of its order(s). Such analysis would be more appropriate in determining a Rule 59 motion to alter or amend or a Rule 60 motion for relief from a judgment or order—not a motion to stay pending appeal.

Regardless of whether the court applies the *Hilton* factors without emphasis on one over the other, or whether the court applies

the *Garcia–Mir* heightened emphasis on the first factor standard, an "individualized judgment" under either leads the court to the conclusion that Defendants' Motion To Stay is due to be granted as to twelve words of the court's three-thousand, seven-hundred and fourteen word Permanent Injunction, and otherwise denied. *See Hilton*, 481 U.S. at 776.

The first *Hilton* factor entails analysis of whether the applicant for the stay has made a "strong showing that he is likely to succeed on the merits," *id.*, while under *Garcia–Mir*, a stay may be warranted if the movant shows the "probable likelihood" of success on the merits. *Garcia–Mir*, 781 F.2d at 1453. This would require a determination that the trial court was "clearly erroneous." *Id. Garcia–Mir* also allows for the granting of a motion to stay upon a "lesser showing of a 'substantial case on the merits' when the balance of the equities [identified in factors 2, 3, and 4] weighs heavily in favor of granting the stay." *Garcia–Mir*, 781 F.2d at 1453. This "lesser showing" is thus nothing more than a conjunctive application of the *Hilton* factors without emphasis on one over the others. A stay is warranted if the movant satisfies *all four* of the elements articulated in *Hilton*. Indeed, the *Garcia–Mir* court noted that even if the movant's likelihood of success on the merits is "substantial," that alone will not support a stay "when the other three factors we must consider point so strongly in the other direction." *Id.* at 1455.

The court's Permanent Injunction was issued after much forethought and deliberation, based on its March 1997 Memorandum Opinion And Order and on its findings based on its review of the record as articulated more fully in its November 1997 Memorandum Opinion And Order and November 1997 Supplemental Opinion And Order. Upon issuance of its Permanent Injunction, the court did not consider the provisions at issue here to be clearly erroneous then, and it declines to so find now. Nor does the court consider the majority of the Attorney General's objections, arguing that the Permanent Injunction tramples free expression in its proscription of state established religion, to be well founded.

■ The court finds that Defendants have neither shown that they are likely to prevail on the merits nor that they have a substantial case on the merits. Apparently the court's forty page March 1997 Memorandum Opinion And Order, the court's seventeen page October 1997 Permanent Injunction, the court's twenty-four page November 1997 Memorandum Opinion And Order, and the court's sixty-two page November 1997 Supplemental Opinion and Order did not make the court's findings sufficiently clear or were ignored: the religiously coercive practices that were ongoing in DeKalb County, Alabama, violate the First Amendment to the United States Constitution as interpreted by the United States Supreme Court and the Eleventh Circuit Court of Appeals. These violations necessitated the court's Permanent Injunction.

The court is aware of the narrow scope of the Defendants' Motion; Defendants merely contend that the provisions of the Permanent Injunction proscribing unconstitutional conduct are "vague" and "overbroad," and that they accordingly "hinder" free expression, not that the underlying actions enjoined are permissible.[6] Nevertheless, as the court has previously made clear, and as the court finds now, given the state of current First Amendment jurisprudence, as articulated by courts with direct authority over this court, as well as the legal standards applicable to the issuance of permanent injunctions, the Defendants have not made a "strong showing" or exhibited a "probable likelihood" of success on the merits. With the exception of a portion of section 6(a) discussed *infra*, the court finds that the Permanent Injunction meets its remedial purpose of proscribing unconstitutional conduct without unduly burdening free expression rights. *See, e.g., Lucero v. Trosch,* 121 F.3d 591 (11th Cir.1997) (citing *Schenck v. Pro–Choice Network,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), and *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), and utilizing analysis of whether injunction provisions burden more speech than necessary to serve relevant government interests). Indeed, this court champions the free expression rights of the citizens of the State of Alabama and of the United States,

exercised, of course, in concert with other First Amendment rights.

The court finds the portions of Plaintiffs' Memorandum In Opposition regarding Defendants' likelihood of success on the merits on appeal to be clear, concise, eminently well written, and most importantly, a correct review of applicable law. Accordingly, the court adopts those portions of Plaintiffs' Memorandum In Opposition as herein articulated:

The October 29 injunction should have come as no surprise to anyone at all familiar with Establishment Clause jurisprudence. Public school officials have long been prohibited by the Establishment Clause of the First Amendment to the United States Constitution from inserting religious exercises into school activities. *See, e.g., Lee .v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (prayer at graduation assemblies); *Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (requirement to teach "creation science"); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (daily prayer in public school classrooms); *Karen B. v. Treen,* 653 F.2d 897 (5th Cir.), *aff'd per curiam,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (classroom prayer by students or teachers); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting copy of Ten Commandments on public school classroom walls); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (statute prohibiting the teaching of evolution); *Abington Schl. Dist. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Bible reading before class by student volunteers); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (nonsectarian prayer at beginning of school day); *Illinois ex rel. McCollum v. Board of Educ.,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (religious instruction on school property during school day).

These unconstitutional school-sponsored activities are not transformed into constitutional activities by the involvement of

---

6. *See* note 3, *supra.*

willing students. *See Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (student-led devotional readings in the classroom); *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471 (3d Cir.1996) (*en banc*) (student-initiated prayer at graduation); *Ingebretsen v. Jackson Public Schl. Dist.*, 88 F.3d 274 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 388, 136 L.Ed.2d 304 (1996) [7] (student initiated prayer at compulsory and noncompulsory school sponsored events); *Jager v. Douglas County Bd. of Educ.*, 862 F.2d 824 (11th Cir.), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989) (student-led prayers and invocations at high school sporting events) [8]; *Hall v. Board of Schl. Comm'rs of Conecuh County*, 656 F.2d 999 (5th Cir. Unit B 1981) (student-led morning devotionals over the school intercom); *Collins v. Chandler Unified Schl. Dist.*, 644 F.2d 759 (9th Cir.1981) (student-led prayer at school assemblies); *Karen B. v. Treen*, 653 F.2d 897 (5th Cir. 1981), *aff'd per curiam*, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (student-led prayers in the classroom).

**7.** *Ingebretsen*, constrained by *Jones v. Clear Creek Independent School District*, 977 F.2d 963 (5th Cir.1992), held that "nonsectarian, nonproselytizing student-initiated prayers" at graduation ceremonies did not violate the Establishment Clause, while simultaneously holding that those same prayers at all other school-sponsored compulsory or noncompulsory activities did. The Fifth Circuit is the only Circuit to adopt the graduation ceremony exception to the Establishment Clause, and the Fifth Circuit's rule is directly defiant of *Lee v. Weisman.*

**8.** Although one might think that any claim of success on appeal in the Eleventh Circuit would focus on the leading Eleventh Circuit case, *Jager v. Douglas County Board of Education*, 862 F.2d 824 (11th Cir.), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), *Jager* is almost completely absent from the Attorney General's discussion, making only a brief parenthetical appearance on page 13 of the Motion for Partial Stay.

**9.** This Court might well say, like the *Ingebretsen* court:

The Attorney General's ... proffered secular purpose of prayer at student sporting events—prohibiting viewpoint discrimination—must be rejected out of hand. While the United States Supreme Court has recognized that prohibiting

The "free exercise" and "free speech" rights of students do not trump the Plaintiffs' rights to be free of Establishment Clause violations. The plaintiffs have argued this since the inception of this case, and the court so found in citing *Barnette*, *Schempp*, and *Jager*. None of this record supports the Attorney General in what the plaintiffs take to be a motion to stay premised on the allegation that the injunction amounts to viewpoint discrimination, and the pretense that it does is at odds with the record. [9]

Relatedly, free speech rights are not absolute. Where "the degree of captivity makes it impractical for the unwilling viewer to avoid exposure," a speaker does not have the absolute right to say exactly what he wants. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). While a speaker "clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 307, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (upholding a ban on political ads in rapid

viewpoint discrimination may serve a secular purpose, *see Mergens*, 496 U.S. at 248, 110 S.Ct. at 2370, the Attorney General has not shown that any of the forums where student prayer is authorized under the statute are open forums and that religious groups have been denied access. The *Mergens* line of cases cited by the Attorney General involves situations where religious groups sought access to public school facilities and were denied for fear that access to these facilities by religious groups would violate the Establishment Clause.... We are not faced with such a situation here. Student assemblies, student sporting events, graduation or commencement, and other school-related activities ostensibly are not open forums in public schools. By granting prayer an exalted status over other types of speech in these forums, the state runs the grave risk of favoring one religion over another or favoring religion over irreligion. *See Board of Educ. of Kiryas Joel v. Grumet*, 512 U.S. 687, 114 S.Ct. 2481, 2491, 129 L.Ed.2d 546 (1994). *Ingebretsen*, 864 F.Supp. at 1490.

The record here shows no instance in which a religious group has ever been denied anything in DeKalb County. Quite the opposite is true; the Gideons have been handed the classrooms. The plaintiffs repeat, as they have argued throughout this case, that violating the Establishment Clause is not a free speech or free exercise right.

transit cars based upon the captive audience). *See also Frisby v. Schultz*, 487 U.S. 474, 487–88, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (allowing a city to limit picketing in front of homes so as to protect persons from unwanted speech while at home).

Students enjoy even less freedom to speak their minds while under the supervision of the public schools. In *Bethel School District v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), cited by the Attorney General, the Court recognized that the free speech rights of students are not co-extensive with the free speech rights of adults. *Id.* at 682. The *Fraser* Court also noted "the obvious concern on the part of parents and school authorities ... to protect children—*especially in a captive audience*—from exposure to" certain speech in school assemblies. *Id.*, 478 U.S. at 684 (emphasis added). *See* Mem. Op., Mar. 12, 1997 at 21 (*quoting Fraser*.)

Previously, in *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Court discussed the limitations on students' rights to speak freely: "[C]onduct by the student, in class or out of class, which for any reason—whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. *See* Mem. Op., Mar. 12, 1997 at 20 (*quoting Tinker*). While the Supreme Court held that the *Tinker* student had a First Amendment right to enage [sic] in the activity at issue (the wearing of a black armband), it first held that this speech did not "impinge upon the rights of other students." 393 U.S. at 509.

The *Jager* court addressed the same concerns raised by the Defendants in this case, and concluded that student-initiated prayers, even at "noncompulsory" events such as football games, violate the Establishment Clause.

In *Jager*, the defendant high school had a practice of permitting prayers and invocations immediately prior to the high school's home football games. *Jager*, 862 F.2d at 826. The prayers were explicitly Christian, "frequently invok[ing] the name of Jesus Christ," and were delivered by members of the local Protestant clergy. *Id.* at 826, 841 n. 2. Since at least 1947, these pregame prayers had been a part of the defendant's football season. *Id.* at 841 n. 2. In response to complaints about the old policy, the school developed a new policy:

> All school clubs and organizations can designate club members to give invocations and any student, parent, or school staff member can seek to deliver an invocation ... the student government will randomly select the invocation speaker and no ministers will be involved in selecting invocation speakers or in delivering invocations. In addition, the schools will not monitor the content of the invocations.

*Jager*, 862 F.2d at 827.[10] Despite these innovations, the *Jager* court still concluded that the policy was in violation of the Establishment Clause.

*Lee* indicates how right the Eleventh Circuit was in *Jager*. The Supreme Court's holding in *Lee* is summarized in its last paragraph which, like the vast majority of the decision, makes no reference to the fact that the prayer was offered by clergy under some particular guidelines and does not take into account the identity of the speaker:

> **The sole question presented** is whether a religious exercise may be conducted at a graduation ceremony in circumstances where, as we have found, young graduates who object are induced to conform. *No holding by this Court suggests that a school can persuade or compel a student to participate in a religious exercise. That is being done here, and it is forbidden by the Establishment Clause of the First Amendment.*

---

**10.** As noted earlier, this was not an official Douglas County School Board policy but rather, vested discretion in school principals.

*Id.* 505 U.S. at 599 (emphasis added). In short, the sole relevant facts are the same here as in *Lee:* (1) prayer in a school program, and (2) a coerced plaintiff. (Pls.' Mem. In Opp'n at 32–38.) Based on the foregoing, the court finds that the first *Hilton* factor cuts against the Defendants.[11]

In addition, the other three *Hilton* factors strongly favor Plaintiffs' position. The second and third factors essentially require the court to weigh the harm that Defendants may incur absent a stay against the harm that Plaintiffs may incur should a stay be granted. Defendants argue that "the movants and other citizens of Alabama are likely to suffer irreparable harm if this Motion is not granted." (Defs.' Mot. at 2.) Closely associated with the court's analysis of the second and third factors are Defendants' contentions regarding the fourth factor: "whether the granting of the stay would serve the public interest." Defendants argue that "the public interest would be served by granting [a stay] in order that the status quo may be preserved pending appeal." (Defs.' Mot. at 2.) Essentially, the Attorney General argues that because he reads the injunction as unduly limiting free expression rights, the better path would be to preserve the status quo pending appeal. Plaintiffs counter that "the *status quo* has been an illegal state of affairs in DeKalb County, Alabama." (Pls.' Opp'n at 6 (emphasis in original).)

As noted, the court finds that Defendants have not shown a likelihood of success on the merits; specifically, that the court's Permanent Injunction does not unduly burden free expression rights in its preservation of individual liberties and proscription of state established religion. Additionally, throughout its previous Orders, the court has expressed its findings that public policy favors Plaintiffs in this action. The status quo, which the Attorney General urges this court to continue, includes, but is not limited to, state sponsored and officially sanctioned religious activity in the DeKalb County schools. Indeed, the Attorney General is not challenging the factual record or thirty years of controlling precedent. (Defs.' Reply at 2.) Nevertheless,

by tying arguments urging preservation of the status quo because of what the Attorney General perceives to be an undue burden on free expression rights with analysis under *Hilton*'s harm to the Defendants and public interest factors, the Attorney General essentially argues for preservation of majoritarian will. As the Attorney General should know, however, the will of the majority makes for sound argument in election disputes and political grandstanding; not in the analysis of First Amendment jurisprudence prohibiting officially sanctioned religious activities that violate the First Amendment.

At minimum, the status quo in DeKalb County violates the First Amendment's dictate that states "pursue a course of complete neutrality toward religion." *Jager v. Douglas County School Dist.,* 862 F.2d 824, 828 (11th Cir.1989) (citing *Wallace v. Jaffree,* 472 U.S. 38, 60, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)).[12] Further, the status quo violates the interests of those counter-majoritarian citizens who choose to exercise religious beliefs, or who choose to not exercise religious beliefs, by forcing upon them, in an official setting, religious beliefs and practices that they may find unwelcome and that smack of state indorsement. The exercise of free expression rights do not justify violations of the Establishment Clause. *See, e.g., Bethel School District v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Consequently, the court finds no merit in Defendants' argument that execution of the Permanent Injunction will result in the harm anticipated by the Defendants.

In addition, the court finds that absent execution of the Permanent Injunction, Plaintiffs will most surely suffer those harms that the Permanent Injunction specifically endeavors to prevent. Defendants will continue to violate Plaintiffs' rights, as evidenced

---

**11.** The court addresses the hypotheticals proffered by the Attorney General in support of his "likelihood of success on the merits" argument, *infra.*

**12.** The Attorney General appears to recognize this established principle of First Amendment jurisprudence. (*See* Defs.' Mem. In Supp. at 21–22 n. 6.)

by their unwillingness to comply with the court's Permanent Injunction, or, for that matter, with Supreme Court and Eleventh Circuit precedent detailing proscribed activity. Despite Defendants': (1) admission that they are "not challenging the court's March 12, 1997 Memorandum Opinion, the factual record in this matter, or thirty years of controlling precedent," (Defs.' Reply at 2); (2) admission that "educators within Alabama's public schools [do not] have the right to subject students to unwanted religious indoctrination," (Defs.' Reply at 7); and (3) recognition of the clear holding of the Eleventh Circuit in *Jager*, where, in the Attorney General's own words, "the court struck down a school district practice of authorizing and organizing invocations to be given prior to public high school football games," (Defs.' Reply at 9 (citing *Jager*, 862 F.2d 824 (11th Cir.1989)), Defendants' *actions* indicate the contrary.

Two Declarations filed by the Plaintiffs on November 24, 1997,[13] to which the Defendants have notably failed to respond, allege that the following occurred at a November 7, 1997 Sylvania High School football game:[14]

1. At about 7:00 p.m., a voice came over the P.A. The voice said there was someone there who had a special message for us. A second voice told us that a recent ruling had banned prayer in school. He said that they wanted us to help them send a message to the federal government and the rest of the country. This voice also said that he had the full support of Fob James, the Governor of Alabama.

2. All of the students were asked to go down to the football field, join hands, and form a circle. The stands cleared, as children from probably kindergarten up to twelfth grade made their way to the field. The circle stretched the width and length of the field, and consisted of students, band members, and cheerleaders. Then a man, middle-aged, wearing glasses, and on crutches because he only had one leg, walked to the middle of the circle. He told all of the children to get down on their knees and raise their hands to heaven. He told them to raise their hands up high because there might be someone there who needed to see this. Next, he said that they were going to pray to their god. There was a brief moment of silence, and then the man led these students in prayer, the Lord's Prayer.

(*See* Neely Decl. ¶¶ 1, 2; *see also* Woodfin Decl. (describing same activity).) In addition, Gary Carlyle, Principal of Sylvania High School, wrote letters to both the Montgomery Advertiser and the Birmingham News that, at best, evidence misunderstanding of the terms of the Permanent Injunction, and at worse, when read in conjunction with the activities described in the Neely and Woodfin Declarations, evidence deliberate defiance. (*See* Pls.' Supplemental Opp'n, Exs. A, A–1.)

Moreover, on November 4, 1997, the Governor of Alabama—a Party to this action—issued a Statement regarding the court's Permanent Injunction. In this Statement, the Governor asserted that the children of the nation's founders "had the benefit of prayer in school," and after reiterating his desire that this court decline to follow United States Supreme Court precedent and instead follow the Governor's interpretation of the United States Constitution, stated: "I will resist Judge DeMent's order by every legal and *political* means with every ounce of strength I possess."[15] (*See* Pls.' November

---

**13.** The Declaration of Susan Jane Neely was filed November 24, 1997. On the same date, Plaintiffs filed their "Supplemental Opposition To 'Defendants' Motion to Stay,'" which contained the hand-written statement of John Woodfin. Woodfin's typed and executed Declaration was filed December 5, 1997.

**14.** Sylvania High School is one of the public schools located in DeKalb County, Alabama. The court's Permanent Injunction was issued October 29, 1997; the described activities occurred subsequent to, and in specific defiance of, the injunction.

**15.** For an extensive overview of the Governor's unique interpretation of the United States Constitution and his misguided opinion as to why lower federal courts are not bound by Supreme Court precedent, see the thirty-four page June 1997 letter from Governor James to the court. In addition to the record, the text of the letter may be viewed, as of December 15, 1997, via the Internet at <http://alaweb.asc.edu/govoff.html$. *See also* Fob James, Jr., *DeMent Followed High Court Deceit*, Birmingham News, December 7, 1997, at 1C.

It is indeed ironic, as Plaintiffs note, that Governor James "simultaneously contend[s] that the Court has no jurisdiction over the first amend-

6, 1997 Mot. To Enjoin Proceedings in the Etowah County Circuit Ct., Ex. B. (emphasis added).)

Based on these explicit and implicit indicia of noncompliance and purported and actual defiance of the law, as well as the myriad media reports that have been called to the court's attention, of which the court takes judicial notice, but on which the court does not rest its findings, it is clear that DeKalb County has allowed prayer at a high school football game in contravention of *Jager* and in specific defiance of the Permanent Injunction, and that the state chief-executive has promised political defiance.[16] It is clear that absent the Permanent Injunction remaining in effect, constitutional violations will continue, as indeed they *have* continued. Consequently, Plaintiffs have and will continue to suffer significant harms.

Contrary to majoritarian wishes, the State of Alabama cannot establish an official religion, either explicitly or implicitly, and officially-sanctioned religious activity in public schools can and must be prohibited to protect the rights of *all* of the citizens of Alabama.[17] On balance, the court finds it more likely that Plaintiffs, and other citizens, will be substantially injured by a stay of the Permanent Injunction than that Defendants will suffer irreparable harm as a result of the enforcement of the Permanent Injunction. Accord-

ingly, the court finds that *Hilton*'s second and third factors cut against the Defendants and that *Hilton*'s public interest factor favors denial of the Motion To Stay, as well.

**B. Interpretation Of The Permanent Injunction**

The Defendants contend that the provisions of the Permanent Injunction at issue are *"facially* unconstitutional," (Defs.' Reply at 2 (emphasis in original)), and that "facial challenges to government enactments must be decided by reference to the contents of the restrictive language in question." (Defs.' Reply at 5.) Under the Attorney General's analysis, the court must look only to the language of the Permanent Injunction itself (on its face) in determining whether it passes constitutional muster or whether the provisions are vague and overbroad, as Defendants contend. (*See generally* Defs.' Reply at 2–6.) When so read, Defendants argue, "[t]hese provisions ... are *facially* unconstitutional, without regard to this Court's previous Orders or the factual basis from which this case arose." (Defs.' Reply at 2 (emphasis in original).)[18]

Plaintiffs counter that the Defendants not only ignore the plain language of the Permanent Injunction, (Pls.' Opp'n at 10), but that the correct " 'inquiry should be whether the parties subject to the injunction understood

ment and then support[s] a stay of the Court's injunction on the ground that it infringes on students' first amendment rights...." (Pls.' Reply at 21–22.)

**16.** The court has no qualms regarding the Governor's promise of *legal* resistance to the court's Orders, and indeed encourages the pursuance of an appeal. Such is the proper procedure for addressing and resolving purported discrepancies in court orders.

**17.** The court suspects that if the Permanent Injunction enjoined non-majoritarian religious, or for that matter atheist or agnostic, beliefs and practices from being forced on school-children in DeKalb county, certain state officials would be first in line to seek enforcement of the court's Permanent Injunction. Such religious prejudice is one of the reasons our forefathers left England for America, and one of the reasons the First Amendment prohibits state-established religion. (*See* November 1997 Supplemental Op. and Order at 60–61 n. 54); *see also Engel,* 370 U.S. at 432. "The right to be free from state-established religion lies at the heart of the concept of 'free-

dom of religion' embodied in the First Amendment." (November 1997 Supplemental Op. and Order at 61 n. 54 (citing *Lee,* 505 U.S. at 591).) "The individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority." *Wallace,* 472 U.S. at 60.

**18.** Interestingly, the Attorney General also states that he "does not dispute Plaintiffs' contentions that the Permanent Injunction should be read in light of this Court's previous rulings." (Defs.' Reply at 3.) The Attorney General then takes the position that "the Permanent Injunction is *inconsistent* with this Court's previous rulings and controlling Supreme Court precedent. For these reasons, Defendants believe that this Court must stay those provisions of the Permanent Injunction which were specified in Defendants [sic] Motion for Partial Stay." (*Id.*) Although not clear, the Attorney General appears to be arguing that the challenged provisions of the Permanent Injunction are unconstitutional on their face, *or,* when read in conjunction with the court's previous Orders, are inconsistent with those Orders, and thus unconstitutional.

their obligations under the order.'" (Pls.' Opp'n at 6 (quoting *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 978–79 (11th Cir.1986), *cert. denied*, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986)).) Plaintiffs urge a reading of the Permanent Injunction in context, and contend that when so read, the "proscriptions are all specific and under the totality of the circumstances give DeKalb County an extremely clear understanding of the conduct that is proscribed." (Pls.' Opp'n at 7.)

In contrast to Defendants' argument that only the face of the Permanent Injunction should be read in construing its terms, the Eleventh Circuit noted in *Combs* that:

> A court may also disregard [a] defect [in an injunction] *if it is clear from the totality of the language in the various documents that [those enjoined] understood their obligations under the injunction.* United States v. Goehring, 742 F.2d 1323, 1324 (11th Cir.1984) (per curiam) (Rule 65(d) not specifically invoked, but contempt order upheld that incorporated earlier order because later order "contains sufficient findings of fact and conclusions of law for this court to perform its proper function and for the appellant to clearly understand the basis for the contempt order.")

*Combs*, 785 F.2d at 978 (emphasis added). *See also Lucero v. Chadwick*, 121 F.3d 591 (11th Cir.1991) (citing *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994))(interpreting injunction in light of *the record* before the court); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)(reviewing the *facts in the record* before the court in analyzing the remedial nature of an injunction). Notably, the Attorney General fails to address or apply these holdings. The court finds that when read in conjunction with the court's other Orders, or even when read facially, the Parties enjoined understand their obligations under the Permanent Injunction, and except as noted, *infra*, the provisions of the Permanent Injunction challenged by the Attorney General are constitutionally sound, are not vague and

overbroad, and are in conformance with standing Supreme Court and Eleventh Circuit precedent.

In contrast to disagreeing about whether the Permanent Injunction, as a whole, should be read standing alone or in conjunction with other pleadings, the Parties agree that internally, "the Injunction must clearly and sufficiently delineate permissible and impermissible conduct." (Defs.' Reply at 9; Pls.' Opp'n at 6 ("The parties being enjoined have the right to know what activities are prohibited").) What is required is "the language of the injunction to be as specific as possible under the totality of the circumstances, such that a reasonable person could understand what conduct is proscribed." *United States v. Kaun*, 827 F.2d 1144, 1153 (7th Cir.1987); *see also Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990) (utilizing "reasonable person" standard in interpreting provision of a district court's permanent injunction and upholding finding of contempt); Fed.R.Civ.P. 65(d) (injunctions should "describe in reasonable detail ... the act or acts sought to be restrained"); (Defs.' Mem. In Supp. at 5 (citing to *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) for the correlative principle that "a statute is void if *persons of common intelligence* must necessarily guess at its meaning and differ as to its application") (emphasis added)). Rule 65 is not to be applied strictly; the inquiry is whether the "parties subject to the injunctive order understood their obligations under the order." *Williams v. City of Dothan, Ala.*, 818 F.2d 755, 761 (11th Cir.1987) (citing *Combs*, 785 F.2d at 978–79).

The Attorney General asserts that "school administrators all across the state are questioning the meaning of this Court's Permanent Injunction." (Defs.' Reply at 3 n. 2.) This assertion is unsubstantiated by any supportive filings, and noticeably fails to address the question of whether the *DeKalb County Board of Education and its individual members* understand its/their obligations under the Permanent Injunction.[19] In contrast to

---

**19.** It is indeed ironic that the Attorney General claims state-wide mass confusion in one forum—this court, but then states that the Permanent Injunction applies only to DeKalb County in another—the media. (*See* Attachment B, December

8, 1997 Press Release from the Office Of The Attorney General ("AG December 8, 1997 Press Release") (stating that "many people in Alabama mistakenly believe the recent federal injunction strictly regulates religious expression in every

the Attorney General's unsupported, self-serving assertion, the DeKalb County Board of Education ("School Board"), *the entity for which the Attorney General purports to speak,* has submitted its "Report to Court of Counsel of DeKalb County Board of Education, et al." In that document, the School Board, individually and acting as a School Board, and the Superintendent, acting through counsel, delineated their efforts "to comply with all open orders of this court in good faith." (DeKalb Sch. Bd. Report To Ct. at 1.) Counsel for the School Board indicated that the following activities had been undertaken pursuant to the court's previous Orders and the court's Permanent Injunction:

(1) A September 30, 1997 in-service for principals, assistant principals and certain administrative personnel of the DeKalb County School System. (*Id.*)

(2) Distribution, at the September 30, 1997 in-service, of a memorandum, composed by School Board legal counsel, explaining the court's Orders and including a copy of the court's March 12, 1997 Memorandum Opinion and Order. (*Id.* at 2.)

(3) The distribution of a memorandum concerning "Student Prayer *en mass* During Lunch" to all principals and other interested persons in the DeKalb County School System on October 2, 1997. (*Id.*)

(4) The mailing of information to all principals, teachers and administrative personnel concerning questions involving religious activities in school on October 21, 1997. (*Id.*)

(5) Submission of a memorandum concerning "Religion in Schools" on October 24, 1997. (*Id.*)

(6) Distribution of documents entitled "Outline of Permanent Injunction of October 29, 1997, What the Board of Education Must Do," and "Outline of Permanent Injunction of October 29, 1997, What We Can and Can't Do" across the DeKalb County School System and to any interested citizen on October 29, 1997. (*Id.* at 5–6.)

(7) Distribution of a position paper or November 5, 1997. (*Id.* at 6.)

Additionally, the Report indicates that the School Board and the Superintendent have undertaken the following in compliance with the Permanent Injunction:

October 30—Memo to Superintendent outlining proposed in-service for principals.

October 31—Principal's in-service meeting. Copies of the following given to each principal:

Permanent Injunction

Timeline of Major Required Activities

Riley Letter

Outline of Permanent Injunction

Copy of Alabama Code 16–1–20.3

November 4—Letter to Gideon's International with copy of Permanent Injunction attached.

November 4—Memo outlining conversation with Mr. Jay Kaiman, Anti-defamation League.

November 6—Memo to Superintendent outlining proposed meeting with local Gideons.

November 8—Meeting with local Gideons. Copies of Permanent Injunction distributed.

November 10—Notification of Permanent Injunction to all teachers.

November 10—Meeting with Association Teacher Representatives, DeKalb County Education Association.

November 12—Memo concerning proposed meeting with Assistant Principals.

November 14—Memo outlining discussion points with Charles Haynes, First Amendment Center.

November 14—Memo to all school [sic] asking for names and addresses of all PTO officers.

November 18—Letter to Plaintiff's [sic] Attorney proposing candidates for monitor and copy of "Find-

school in the state, when in fact, these prohibitions only apply to the DeKalb County school

system"); *see also,* Pls.' Add. Evid.)

ing Common Ground" for preview.

November 24—Fax communication from First Amendment Center.

November 25—Board of Education approves policy "Distribution of Literature—Student Rights and Protection". [sic]

November 25—Copy of proposed policy mailed to Plaintiff's [sic] Attorney.

(DeKalb Sch. Bd. Report To Ct. at 3–4.) [20]

To ensure that enjoined parties receive adequate notice of the precise conduct that is prohibited, Rule 65 requires that an injunction be specific in its terms and describe in reasonable detail the act or acts enjoined. Fed.R.Civ. p. 65(d); *Alabama Nursing Home Association v. Harris,* 617 F.2d 385 (5th Cir.1980).[21] In reading the terms of an injunction, the *Harris* court noted that "[a]n injunction does not prohibit those acts that are not within its terms as *reasonably con-*

strued." *Harris,* 617 F.2d at 388. In *Schering Corp. v. Illinois Antibiotics Co.,* 62 F.3d 903 (7th Cir.1995), *reh'g denied* (Sept. 12, 1995), the Seventh Circuit articulated why a *reasonable* construction is necessary: "[T]he rule of strict construction of injunctions should not be pressed to a dryly logical extreme. If narrow literalism is the rule of interpretation, injunctions · will spring loopholes ... and parties in whose favor injunctions run will be inundating courts with requests for modification in an effort to plug the loopholes." *Id.* at 906. Equally apparent is that unreasonable constructions and "narrow literalism" will lead to precisely the type of hypothetical "loopholes" offered by the Attorney General as examples of the Permanent Injunction's infirmity. The terms of the court's Permanent Injunction must be read reasonably, logically, and in their entirety; not in the selective splicing of words and phrases that inundate the Attorney General's Motion and Memorandum In Support thereof.[22]

20. The reporting Defendants further informed the court that "substantial pressure has been exerted toward persons attempting to comply with the orders of this court. The defendants have experienced great criticism regarding their position." (DeKalb Sch. Bd. Report To Ct. at 4.) In addition to copies of the distributed documents outlined above, copies of representative articles, editorials, and letters published since September 30, 1997 for and against the position of the reporting Defendants were attached. (*Id.*)

The court notes the difficult position in which some enjoined Defendants are placed by the provisions of the court's Permanent Injunction. Nevertheless, appointment or election to public office does not justify imposition of personal or political views contrary to established law. There is no doubt that some of the criticism is heightened by political agitation. But, the DeKalb School Board and its individual members would not have found themselves "experienc[ing] great criticism regarding their position'" if they had complied with long-standing legal precedent from the beginning. While the court is sympathetic to Defendants' situation, it is, ultimately, one of their own making.

**The court does, however, recognize and specifically command the School Board, its Superintendent, and their counsel for their good faith efforts to comply with the Orders of the court. Apart from the November 7, 1997 activities at a Sylvania High School football game,** *which greatly concern the court,* **and which should also greatly concern the School Board, a cursory review of the December 4, 1997 Report To Court, along with its attachments, evidence a concerted effort to not only rectify, but to educate, inform,**

**and to obey the law, like it or not. As counsel for the School Board noted in an October 21, 1997 memorandum to DeKalb County School System principals, teachers, and administrative personnel addressing questions concerning religious activity in school: "The school prayer·case is bleeding our educational system here in DeKalb County of financial resources we desperately need. Our teachers need to recognize this fact and govern themselves accordingly....** *If you are not running for public office, or have some other hidden agenda, please become part of the solution and don't become part of the problem."* **(DeKalb Sch. Bd. Report To Ct., October 21, 1997 Mem. at 7–8 (emphasis added).)**

21. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

22. The Attorney General appears to recognize the basic maxim that particular words and phrases in any judicial order or legislative enactment should ordinarily be read logically and consistently with the other words and phrases in the same sentence, paragraph, and/or Order, as applicable. In Defendants' Reply, the Attorney General cites *United States v. Kaun,* 827 F.2d 1144 (7th Cir.1987) "for the principle that the injunction should be viewed under a totality of circumstances through the eyes of a reasonable person." (Defs.' Reply at 4.)

Nevertheless, as Plaintiffs note, in challenging provisions of the Permanent Injunction as vague

Following, is a restatement of the challenged provisions of the Permanent Injunction followed by a summarization of the Attorney General's objections. Except for the court's analysis under section 6(e), the court's analysis of the Attorney General's objections follow this restatement and summarization.

### 1. *Section 6(a)*

■ In its entirety, section 6(a) of the court's Permanent Injunction reads as follows:

(a) *Regarding Classroom Activities and Instructional Settings.* The Defendants, and each of them, are PERMANENTLY ENJOINED from aiding, abetting, commanding, counseling, inducing, ordering, procuring, or permitting *school organized* or *officially sanctioned* religious activity in the classrooms of DeKalb County schools *including, but not limited to:* vocal prayer; Bible and religious devotional or scriptural readings; distribution of religious materials, texts, or announcements; and discussions of a devotional/inspirational nature, regardless of whether the activity is initiated, led by, or engaged in by students. This PERMANENT INJUNCTION DOES NOT proscribe the educational use of religious texts in the classroom to the extent that material so used is presented in an objective and academic manner, for example, as part of a course of study. This PERMANENT INJUNCTION DOES NOT proscribe students' voluntary expression of their own religious beliefs in the form of homework, reports, artwork, or other school assignments as applicable and as academically appropriate. This PERMANENT INJUNCTION DOES NOT proscribe the display of religious symbols, articles and medals (for example, Crosses and Stars of David) and/or clothing bearing religious messages (provided that the school allows students to display non-religious expressive symbols and apparel and such display is in accordance with all applicable time, place, and manner restrictions).

This PERMANENT INJUNCTION DOES NOT affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent with the federal Equal Access Act, 20 U.S.C. Section 4071 *et seq.*, or to quietly engage in religious activity during noninstructional times, *so long as it does not unduly call attention thereto and so long as it does not interfere with the rights of other students to freely pass thereby or to avoid its imposition upon themselves.* This PERMANENT INJUNCTION DOES NOT prohibit students from distributing religious materials to classmates during noninstructional time, subject to the same time, place, and manner restrictions imposed on student distributions of nonreligious materials, subject to the provisions of paragraph 6(e) below.

(*See* Permanent Inj. at 3–4 (emphasis in original).) Not only a reasonable reading, but even a narrowly literal reading, discloses that what this provision prohibits is:

(1) *School organized* or *officially sanctioned* religious activity in the classrooms of DeKalb County schools *including, but not limited to* vocal prayer.

(2) *School organized* or *officially sanctioned* religious activity in the classrooms of DeKalb County schools *including, but not limited to* Bible and religious devotional or scriptural readings.

(3) *School organized* or *officially sanctioned* religious activity in the classrooms of DeKalb County schools *including, but not limited to* distribution of religious materials, texts, or announcements.

(4) *School organized* or *officially sanctioned* religious activity in the classrooms of DeKalb County schools *including, but not limited to* discussions of a devotional/inspirational nature, re-

---

and overbroad, the Attorney General's "examples are themselves vague, being spectres intended to induce fear and horror, rather than concrete factual situations." (Pls.' Opp'n at 9.) Certainly the majority of the Attorney General's "narrow literalism" is not in keeping with *Harris'* admonition to reasonably construe the terms of an injunction or with the Attorney General's own reading of *Kaun.*

gardless of whether the activity is initiated, led by, or engaged in by students.

Clearly, this provision enjoins *school organized,* or *officially sanctioned* religious activity.[23] As other provisions of the Permanent Injunction clearly articulate, **students are free to engage in any or all of these activities** as long as they are not *school organized* or *officially sanctioned* . For example, as the court took pains to note, the Permanent Injunction does not proscribe: (1) the educational use of religious texts in the classroom to the extent that the material is presented in an objective and academic manner; (2) students' voluntary expression of their own religious beliefs in the form of various school assignments as applicable and as academically appropriate; (3) the display of religious symbols or clothing bearing religious messages consistent with a school's applicable time, place and manner restrictions; (4) secondary-school students from engaging in religious activity during noninstructional time consistent with the Equal Access Act; (5) secondary-school students from "quietly engag[ing] in religious activity during noninstructional times, so long as it does not unduly call attention thereto and so long as it does not interfere with the rights of other students to freely pass thereby or to avoid its imposition upon themselves" (Permanent Inj. at 4);[24] and (6) student distribution of religious materials to classmates during noninstructional time, subject to the same time, place and manner restrictions

23. The Attorney General admits that he is not challenging *"the Permanent Injunction's proscriptions with regard to school sponsored, officially organized religious activity,"* and that "[t]his law is settled." (Defs.' Reply at 10 (emphasis in original).) Nevertheless, the Attorney General then proceeds to challenge section 6(a), which a literal reading discloses merely enjoins *"school organized* or *officially sanctioned* religious activity." (Permanent Inj. At 3.)

24. The Attorney General particularly objects to the word "quietly" and the phrase "so long as it does not unduly call attention thereto" in one paragraph of section 6(a) as unduly vague and in violation of *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). (Defs.' Mem. In Supp. at 8.) Specifically, *Tinker* provides that proscriptions be tailored to "the requirements of appropriate discipline in the operation of the school." *Id.* at 509.

In context, these words are part of section 6(a)'s proscription of school organized or officially sanctioned religious activity. They are stated in the fourth of four paragraphs detailing what the Permanent Injunction *does not* proscribe. They are part of the court's notation that "[t]his PERMANENT INJUNCTION DOES NOT affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent with the federal Equal Access Act ..., or to *quietly* engage in religious activity during noninstructional times, *so long as it does not unduly call attention thereto and so long as it does not interfere with the rights of other students to freely pass thereby or to avoid its imposition upon themselves."* (Permanent Inj. at 4 (italics in original) (underlining added).)

Consistent with *Tinker*, and with the court's emphasis on applying identical time, place, and manner restrictions to religious and other types of conduct, a more detailed enunciation perhaps could read: "This PERMANENT INJUNCTION does not affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent with the federal Equal Access Act ..., or to engage in religious activity during noninstructional times *so long as it does not interfere with the rights of other students, is consistent with the school's applicable time, place, and manner restrictions regarding any other type of conduct during noninstructional times, and such policy is enforced consistently, regardless of the content of the conduct being proscribed."*

The court finds that the words underlined above may not be sufficiently narrowly tailored, and thus finds that the Motion To Stay as to these twelve words of the court's three-thousand, seven-hundred and fourteen word Permanent Injunction is due to be granted. *In staying the word "quietly," and the phrase "so long as it does not unduly call attention thereto and,"* however, the court notes that it is *merely clarifying what students have always been allowed to do consistent with the Permanent Injunction and established First Amendment law: engage in religious-activity that is not officially sanctioned or coerced and that does not infringe on the rights of others. See Tinker*, 393 U.S. at 513.

The Parties are put on notice, however, that inconsistent enforcement of school rules that work to favor religious conduct over other types of conduct may be construed as state promotion or indorsement of religion or a particular religion over other religions or non-religion. The First Amendment requires the government to remain strictly neutral among religions and between religion and non-religion. *Jager*, 862 F.2d at 828. Further, as the *Tinker* court noted: **"[C]onduct by the student, in class or out of class, which for any reason—whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional**

imposed on student distributions of nonreligious materials.[25] Not only a reasonable, but a literal reading of the terms of section 6(a) show a clear delineation between *"school organized or officially sanctioned religious activity,"* (Permanent Inj. at 3), and non-school organized, non-officially sanctioned student conduct.

Nevertheless, the Attorney General contends that under his reading of section 6(a), the following could be prohibited:

(1) Discussions in a history class dealing with the contributions of historical figures to modern day society. (Defs.' Mem. In Supp. at 5.)

(2) Discussions of the meaning or origin of certain state-recognized holidays. (*Id.* at 1, 6.)

(3) Bible reading and discussion among students in a study hall or homeroom period, even if not disruptive of the classroom setting. (*Id.;* Defs.' Reply at 11.)

(4) Student-initiated Bible club meetings on campus after school hours. (*Id.* at 7.)

(5) Students praying before lunch. (Defs.' Reply at 12.)

(6) A student giving a flyer to another student about an event at his church or youth group.

2. *Section 6(b)*

■ In its entirety, section 6(b) of the court's Permanent Injunction reads as follows:

(b) *Regarding Graduation or Commencement Exercises.* The Defendants, and each of them, are PERMANENTLY ENJOINED from aiding, abetting, commanding, counseling, inducing, ordering, procuring, participating in, or permitting, prayers, invocations, benedictions, or devotional messages at graduation or commencement exercises, regardless of whether such prayer, invocation, benediction, or devotional message is offered by clergy, a student, administrator, teacher, school employee, or nonschool person, regardless of how such prayer, invocation, benediction, or devotional message is denominated, and regardless of whether a public-address system is used. The Defendants, and each of them, are specifically PERMANENTLY ENJOINED from permitting such activity at commencement or graduation exercises in the guise of valedictory, salutatory, historian, or similar student addresses and remarks.

This PERMANENT INJUNCTION DOES NOT proscribe a brief personal expression by a student which contains religious references during a commencement exercise or student address (for example, a student may express thanks to Deity for his or her academic success),[26] provided that such expression is not encouraged in any way by school officials and does not invite audience participation or response (for example, a student speaker may not invite the audience to participate with him or her in prayer or urge the audience to take a moment with him or her to thank Deity). Where enjoined activity by students occurs, it is CONSIDERED that school officials be and they are hereby ORDERED to take appropriate disciplinary action as they would for any violation of school disciplinary rules, said disciplinary action being calculated to cause the cessation of the violative conduct as it occurs and to deter similar conduct in the future.

guarantee of freedom of speech." *Tinker,* 393 U.S. at 513 (emphasis added).

25. Here, the Permanent Injunction refers readers to section 6(e), where the court requires DeKalb County to promulgate "a written policy of general application for all DeKalb County public schools ... to govern such distributions in terms of time, place, and manner restrictions." (Permanent Inj. at 9.) In 6(e), the court reemphasizes that the Permanent Injunction "DOES NOT prohibit student distribution of religious materials to classmates during noninstructional time, subject to the same time, place and manner restrictions imposed on student distribution of nonreligious materials." (Permanent Inj. at 10.)

26. This is but one example of a brief permissible reference by a student to Deity or religion. This example is not meant by the court to suggest any form of expression to any student or to suggest that this is the only such reference that would be permissible. It is intended to be illustrative only, and to assist school officials in complying with the terms of this PERMANENT INJUNCTION. (Permanent Injunction at 5, n. 1.)

The Defendants, and each of them, are further PERMANENTLY ENJOINED from listing, announcing, or memorializing any religious activity or message on any commencement program at any DeKalb County school. The Defendants, and each of them, are specifically PERMANENTLY ENJOINED from printing baccalaureate announcements or commemorations or other materials regarding baccalaureate services on the commencement programs of DeKalb County public schools and from organizing or sponsoring any baccalaureate event (although they may attend). School officials are prohibited from encouraging or discouraging, directly, or indirectly, a student's attendance at baccalaureate services. Specifically, school officials may not condition a student's attendance at commencement exercises on attendance at baccalaureate events.

(*See* Permanent Inj. at 4–6 (emphasis in original).) Prohibited under section 6(b) are:

(1) Prayers, invocations, benedictions, or devotional messages at graduation or commencement exercises.

(2) Such activity in the guise of valedictory, salutatory, historian, or similar student addresses and remarks.

(3) The listing, announcing, or memorializing of any religious activity or message on any commencement program at any DeKalb County school.

(4) The printing of baccalaureate announcements or commemorations or other materials regarding baccalaureate services on the commencement programs of DeKalb County public schools.

(5) The organization or sponsorship of any baccalaureate event by school officials.

(6) School officials encouraging or discouraging, directly or indirectly, a student's attendance at baccalaureate services.

(7) School officials conditioning a student's attendance at commencement exercises on attendance at baccalaureate events.

Prayers, invocations, benedictions, or devotional messages at graduation or commencement exercises are prohibited regardless of whether offered by clergy, a student, administrator, teacher, school employee, or non-school person, regardless of how denominated, and regardless of whether a public-address system is used. When violations occur, school officials are directed to take "appropriate disciplinary action as they would for any violation of school disciplinary rules." (Permanent Inj. at 6.)

Again, the court took pains to note what section 6(b) does not proscribe:

(1) A brief personal expression by a student which contains religious references during a commencement exercise or a student address that is not encouraged by school officials and that does not invite audience participation or response.[27]

The Attorney General contends that section 6(b) is vague, (Defs.' Mem. In Supp. at 9; Defs.' Reply at 12), and under his reading of section 6(b), a student valedictorian could be prohibited from explaining why Mother Teresa was an inspiration for his or her success. (Defs.' Reply at 12.) The Attorney General also contends that when he reads section 6(b) literally, it: (1) could require the school to "police all in attendance" (Defs.' Mem. In Supp. at 9); (2) discriminates against private religious speech based on its content and viewpoint (*Id.* at 9–11); (3) would lead to school officials censoring a student graduation speaker's thoughts before a speech was given (Defs.' Mem. In Supp. at 2); (4) violates the Establishment Clause by requiring state entanglement with religion (*Id.* at 11–12); and (5) violates Supreme Court and Eleventh Circuit precedent. (*Id.* at 12–14.)

The court also explained that the permissible "personal expression by a student ... may not invite the audience to participate with him or her in prayer or urge the audience to take a moment with him or her to thank Deity." (Permanent Inj. at 5–6.)

27. The court specifically noted that a student may express thanks to Deity for academic success and emphasized that the court was not suggesting that this was the only such reference that would be permissible. The court's example was meant to be "illustrative only," and articulated to "assist school officials in complying with the terms of this PERMANENT INJUNCTION." (Permanent Inj. at 5 n. 1 (emphasis in original).)

#### 3. *Section 6(c)*

■■ In its entirety, section 6(c) of the court's Permanent Injunction reads as follows:

(c) *Regarding Use of Public–Address Systems for Religious Addresses.* The Defendants, and each of them, are PERMANENTLY ENJOINED from aiding, abetting commanding, counseling, inducing, ordering, procuring, participating in, or permitting, students, school employees, school officials, clergy, and nonschool persons to pray or to deliver religious or devotional messages (including scriptural readings) over any public-address system during the instructional day (including the home room period) or in connection with any school-sponsored event, including, but not limited to, assemblies and sporting events. This provision includes the delivery of daily announcements. No exception to this provision shall be permitted during times of perceived crisis or exigent circumstances. Where enjoined activity by students occurs, it is CONSIDERED that school officials be and they are hereby ORDERED to take appropriate disciplinary action as they would for any violation of school disciplinary rules, said disciplinary action being calculated to cause the cessation of such violative conduct as it occurs and to deter similar conduct in the future.

This PERMANENT INJUNCTION DOES NOT prohibit students from making announcements over the school public-address system regarding meetings of noncurricular religious clubs, provided that the announcements themselves do not contain a prayer or devotional, and provided that any such announcements are subject to the same time, place, and manner restrictions that apply to announcements of nonreligious activities.

(Permanent Inj. at 6–7 (emphasis in original).) Activity prohibited under section 6(c) include:

(1) The delivery of prayers, religious or devotional messages (including scriptural readings) over any public-address system during the instructional day, including: the home room period, the delivery of daily announcements, and in connection with any school-sponsored events.

When violations by students occur, school officials are directed to "take appropriate disciplinary action as they would for any violation of school disciplinary rules." (Permanent Inj. at 7.)

The court specifically noted that students could make announcements over a school public-address system "regarding meetings of noncurricular religious clubs, provided that the announcements themselves do not contain a prayer or devotional, and provided that any such announcements are subject to the same time, place, and manner restrictions that apply to announcements of nonreligious activities." (Permanent Inj. at 7.)

The Attorney General contends that 6(c)'s restrictions regarding the use of school public address systems for religious addresses are unconstitutional because they are vague and overbroad. (Defs.' Mem. In Supp. at 14–15.) Under his reading of this provision: (1) "Muhammad Ali would not be able to address the student body and share his life's [sic] story;" and (2) "school officials would be required to censor all student speeches which occur as part of any school assembly." (Defs.' Mem. In Supp. at 2.)

#### 4. *Section 6(d)*

■■ In its entirety, section 6(d) of the court's Permanent Injunction reads as follows:

(d) *Regarding School–Sponsored Assemblies and Events.* The Defendants, and each of them, are PERMANENTLY ENJOINED from aiding, abetting, commanding, counseling, inducing, ordering, procuring, or otherwise participating in, or permitting, prayers, Biblical and scriptural readings, and other presentations or activities of a religious nature, at all *school-sponsored or school-initiated* assemblies and events (including, but not limited to, sporting events), regardless of whether the activity takes place during instructional time, regardless of whether attendance is compulsory or noncompulsory, and regardless of whether the speaker/presenter is a student, school official, or nonschool person.

This PERMANENT INJUNCTION DOES NOT prevent secondary-school students from engaging in religious expression and activity during noninstructional time that is consistent with the federal Equal Access Act, 20 U.S.C. Section 4071 *et seq.*, which, while according students expressive rights, does not allow school officials to provide special privileges to noncurricular student religious clubs in terms of meetings and assemblies that they do not provide to other student clubs.

(Permanent Inj. at 7–8 (emphasis in original).) Section 6(d) prohibits:

(1) Prayers, Biblical and scriptural readings, and other presentations or activities of a religious nature, at all *school-sponsored* or *school-initiated* assemblies and events, regardless of whether the activity takes place during instructional time, whether attendance is compulsory or noncompulsory, and regardless of the speaker.

The court noted that the Permanent Injunction did not interfere with the Equal Access Act, and specifically noted that the Act accords students expressive rights but "does not allow officials to provide special privileges to noncurricular student religious clubs in terms of meetings and assemblies that they do no provide to other student clubs." (Permanent Inj. at 8.)

Section 6(d) is challenged because the Attorney General reads its provisions to be "grossly overbroad" and "literally would prevent: (1) a parent from praying silently in the stands at a football game" (Defs.' Reply at 13); (2) "a group of football players gathering together before a school game to pray" (Defs.' Mem. In Supp. at 15–16); (3) "a football player who scores a touchdown during a game from kneeling down in the endzone to pray" (*Id.* at 16); and (4) the singing of

"Silent Night" and other songs at a school Christmas play or concert. (*Id.*) [28]

5. *Section 6(e)*

██ In its entirety, section 6(e) of the court's Permanent Injunction reads as follows:

(e) *Regarding Distribution of Bibles and Other Religious Tracts.* The Defendants, and each of them, are PERMANENTLY ENJOINED from aiding, abetting, commanding, counseling, inducing, ordering, procuring, or otherwise permitting, school officials or nonschool persons to enter any classroom or any school property where students are assembled, for the purpose of distributing Gideon Bibles or other religious tracts, literature, or paraphernalia to students on school property during the school day, including the home room period and any period during which students are required to be present in school, or at any school-sponsored event.

No distribution of Gideon Bibles or other religious tracts, literature, or paraphernalia by placement of them in a common area shall occur in the absence of a formal, written policy adopted by the DeKalb County Board of Education governing distribution of materials from nonschool persons in DeKalb County public schools generally.

It is further CONSIDERED that Defendants be and the same are hereby ORDERED that within thirty (30) days of the date of this PERMANENT INJUNCTION, Defendants shall promulgate a written policy of general application for all DeKalb County public schools, binding upon all school principals, teachers, and other school employees uniformly in each public school in DeKalb County, to govern

---

**28.** After a detailed search of the Permanent Injunction, the March 1997 Memorandum Opinion and Order, the November 1997 Memorandum Opinion and Order, and the November 1997 Supplemental Opinion and Order, the court can find no reference to a ban on the singing of "Silent Night" or other songs at a school Christmas play or concert. *Any* school sponsored or officially sanctioned activity must simply comport with standing Supreme Court and Eleventh Circuit law, as well as the terms of the court's Permanent Injunction. Clearly read, section 6(d)

prohibits such activities that are *primarily* of a "religious nature." As section 6(a) notes, the expression of religious material in an objective, academically appropriate manner is clearly permissible. And, as section 6(c) notes, "religious or devotional" messages may not be delivered over a public address system during the instructional day. Section 6(d) merely proscribes the delivery of such *officially sanctioned, content-focused messages in school-sponsored assemblies and events.*

such distributions in terms of time, place, and manner restrictions; and Defendants shall serve a copy of the same upon Plaintiffs' counsel, who, within ten (10) days, shall list any objections, and shall submit the same to this court for its rejection or concurrence. Following court approval, the Defendants shall publish and shall distribute to each school principal a copy of the written policy, with instructions that it shall be followed in each DeKalb County public school.

It is further CONSIDERED that Defendants be and the same are hereby ORDERED to provide *immediately* to the Gideons International representatives who are known by them to have visited DeKalb County schools, or to their designated organizational representative, a copy of this PERMANENT INJUNCTION.

It is further CONSIDERED that Defendants be and the same are hereby ORDERED to inform the organization in writing, *immediately,* that students shall not be harassed with regard to acceptance or nonacceptance of any Gideon Bibles that may occur while its representatives are situated on public property near the school, (such as the public sidewalk), if students who are approached for distribution are still situated on or boarding school property, and that they shall not throw or pass Gideon Bibles through the windows or doors of DeKalb County school buses or otherwise act in an aggressive manner toward students with regard to any distribution of Gideon Bibles while those students are still situated on school property (for example, standing in line in the school parking lot to board the bus and still under school officials' general supervision and protection, or boarding the public school bus).

It is further CONSIDERED that Defendants be and the same are hereby ORDERED to send a copy of this written notification to Plaintiffs' counsel and to file a copy with the court.

It is further CONSIDERED that Defendants be and the same are hereby ORDERED to follow the exact steps enumerated herein for any nonschool group or person other than the Gideons International that wishes to have access to students for the purpose of distributing Bibles, religious tracts, religious literature, or religious paraphernalia.

In the event of a violation of this PERMANENT INJUNCTION, and in the event of aggressive or harassing behavior of the sort proscribed herein, school officials shall take action to cause the violative conduct to cease immediately.

This PERMANENT INJUNCTION DOES NOT prohibit students from distributing religious materials to classmates during noninstructional time, subject to the same time, place and manner restrictions imposed on student distributions of nonreligious materials.

(Permanent Inj. at 8–11 (emphasis in original).)

The Attorney General challenges section 6(e), contending that it "violates the Gideon's right to distribute religious literature in a traditional public forum without a compelling state interest." (Defs.' Mem. In Supp. at 17; *see also* Defs.' Reply at 16–21.) Plaintiffs contend that the Attorney General does not have standing "to challenge the alleged chilling of the Gideons' alleged free-speech rights." (Pls.' Opp'n at 30.) This, Plaintiffs argue, "is the Gideons' burden." (*Id.*) The Attorney General counters that he does have standing because: (1) "the Attorney General has both a legal right and an obligation to defend the constitutional rights of the citizens of Alabama" (Defs.' Reply at 14); (2) "the Attorney General has sworn, under oath, to abide by the laws of the State of Alabama and the United States, and at all times to secure their enforcement" (*Id.* at 15); (3) as "a named party to this lawsuit . . . the Attorney General has every right to raise vagueness/overbreadth issues which arise in the course of this litigation" (*Id.*); and (4) the Attorney General represents the State and DeKalb County Boards of Education, the Permanent Injunction requires these Parties to take steps which the Attorney General contends "will chill the free speech rights of a party," and "[c]onsequently, the Attorney General has standing, on behalf of his clients, and himself individually, to raise the Gideon's free speech rights." (*Id.*)

Although the court has doubts regarding the Attorney General's ability to speak for the Gideons, *see Lucero,* 121 F.3d at 605 n. 25 (quoting *Madsen,* 512 U.S. at 775–77 ("[Defendants] themselves are named parties in the order, and they therefore lack standing to challenge a portion of the order applying to persons who are not parties")), regardless of the standing issue, a reasonable and literal reading clearly shows that section 6(e) merely prohibits:

(1) School officials or nonschool persons from entering any school property where students are assembled, for the purpose of distributing Gideon Bibles or other religious tracts, literature, or paraphernalia to students *on school property during the school day* or at any *school sponsored* event.

(2) The distribution of Gideon Bibles, religious tracts, literature, or paraphernalia by placement in a common area *absent* a "formal, written policy ... governing distribution of materials from nonschool persons in DeKalb County public schools generally." (Permanent Inj. at 8–9 (emphasis added).)

As noted above, section 6(e) specifically emphasizes that the Permanent Injunction "DOES NOT prohibit students from distributing religious materials to classmates during noninstructional time, subject to the same time, place and manner restrictions imposed on student distributions of nonreligious materials." (Permanent Inj. at 11 (emphasis in original).) In its November 1997 Supplemental Opinion and Order, the court also stated that:

The court does not wish by the terms of its injunction to discriminate against the Gideons International. The court does not intend by its injunction to single out the Gideons for discriminatory treatment or to infringe upon their free-speech rights. By the same token, the court is disturbed by the absence of uniform regulation by school officials and the 'gap' this leaves in the delicate area of the interplay between the rights of nonschool persons and students. It is for this reason that the court's injunction makes reference to the location of students. The court takes it as a simple truism that, where the public schools are concerned, adult nonschool persons cannot harass or act aggressively toward students in regard to distributing *any* materials, religious or otherwise. Such conduct would not be reasonable in time, place and *manner.*

(November 1997 Supp. Op. And Order at 51–52.)

Section 6(e) also requires the following:

(1) A promulgated, written policy applicable in all DeKalb County public schools governing distributions in terms of time, place, and manner restrictions.

(2) Publication and distribution of a written copy of such policy with instructions that it shall be followed to each school principal, with instructions that it shall be followed in each DeKalb County public school.

(3) That a copy of the Permanent Injunction be provided to the Gideons.

(4) That the Gideons be informed in writing "that students shall not be harassed with regard to acceptance or nonacceptance of any Gideon Bibles that may occur while its representatives are situated on public property near the school ... *if* students who are approached for distribution are still situated on or boarding school property...." (Permanent Inj. at 10 (emphasis in original).)

(5) That the Gideons be informed additionally, that "they shall not throw or pass Gideon Bibles through the windows or doors of DeKalb County school buses or otherwise act in an aggressive manner toward students with regard to any distribution of Gideon Bibles while those students are still situated on school property...." (Permanent Inj. at 10.) [29]

---

**29.** The court specifically noted that "still situated on school property" meant, for example, while students were ... "standing in line in the school parking lot to board the bus and still under school officials' general supervision and protection, or boarding the public school bus." (Permanent Inj. at 10.)

(6) That the same steps be followed "for any nonschool group or person other than the Gideons International that wishes to have access to students for the purpose of distributing Bibles, religious tracts, religious literature, or religious paraphernalia." (*Id.*)

(7) That school officials "take action to cause ... violative conduct to cease immediately" in the event of violations of the injunction and in the event of "aggressive or harassing behavior of the sort proscribed herein." (*Id.*)

Regardless of the standing issue, on November 18, 1997, the Superintendent of Education for the DeKalb County Board of Education provided to the court a copy of a November 4, 1997 correspondence sent to the Gideons International. The Superintendent informed the court that, in addition to sending such correspondence to the Gideons International, he had met with local leaders of the Gideons International "to present the injunction and answer questions." (November 18, 1997 Correspondence from Superintendent of Educ. to the court, Attachment A.) [30] On November 25, 1997, Plaintiffs filed a pleading indicating the DeKalb County Board of Education's compliance with section 6(e). The substance of the correspondence from the DeKalb County Board of Education to the Gideons International reads as follows:

Please find attached to this letter a copy of a permanent injunction issued by Judge Ira DeMent of the United States District Court for the Middle District of Alabama, Northern Division.

Judge DeMent has ordered that you be provided with a copy of this injunction and that you be informed that students shall not be harassed with regard to acceptance or nonacceptance of any Gideon Bibles while Gideon representatives are situated on public property near the school, and that Gideons shall not throw or pass Gideon Bibles through the windows or doors of school buses or otherwise act in an aggressive manner toward students with regard to any distribution of Gideon Bibles while those students are still situated on school property.

(*See* November 4, 1997 Correspondence from DeKalb County Bd. of Educ. Superintendent of Educ. to the Gideons International, Pls.' Notice of Compliance, Ex. A.)

Further, on December 2, 1997, Plaintiffs filed their "Notice Of No Objection To DeKalb County Board Of Education's Policy Regarding Distribution Of Materials By Nonschool Persons." ("Pls.' Notice of No Objection"). Plaintiffs state that "they have confirmed in a conversation with DeKalb County counsel that the policy proposed ... as to distribution of nonschool materials was in fact adopted by the DeKalb County Board of Education last week." The policy reads as follows:

### Distribution of Literature Student Rights and Protection

The DeKalb County School Board of Education recognizes the right of students to distribute literature on public school property, subject to reasonable time, place and manner restrictions imposed by the school. Such restrictions should be reasonable and must apply evenly to all nonschool student distributed literature.

DeKalb County schools may prohibit the distribution of literature that is obscene, defamatory, or disruptive of the educational environment.

The DeKalb County Board of Education prohibits the distribution by DeKalb County school board employees and nonschool individuals of commercial, political, religious or promotional materials to students on public school property.

(Pls.' Notice of No objection, Ex. A, proposed policy for literature distribution.)

Clearly, the DeKalb County Board of Education understood its obligations under section 6(e) of the Permanent Injunction. Not only did DeKalb County comply with those provisions addressing the Gideons International, it also complied with those provisions requiring the promulgation of a written policy governing the distribution of materials in DeKalb County schools. In correspondence dated November 25, 1997, the Superinten-

---

**30.** This information was also reported in the DeKalb School Board's December 4, 1997 Report To Court.

dent of Education for DeKalb County stated that "[o]n Page 9 of the Permanent Injunction, provisions are made for a review and the listing of any objection within ten days. I will wait for Court approval, and possible revision, before officially implementing this policy in DeKalb County Schools." (*Id.*) Based on the foregoing, the court finds that, without addressing the propriety of section 6(e), the substantive provisions therein have been substantially complied with, and any objections relating thereto are accordingly moot.

### 6. *Section 7*

In essence, section 7 of the Permanent Injunction requires the following:

(1) The distribution of the court's opinions and Permanent Injunction to school principals in DeKalb County with instructions that each principal inform faculty, staff and students that the court requires compliance. (Permanent Inj. at 12.)

(2) That in each DeKalb County public school, a copy of the Permanent Injunction be made available or posted in areas commonly utilized for communicating notices or information to both students and faculty until the Permanent Injunction expires. (*Id.*)

(3) That a copy of "The Riley Letter" and a copy of the monograph entitled "Religion in the Public Schools: A Joint Statement of Current Law" remain available in each DeKalb County public school library until expiration of the Permanent Injunction. (*Id.*)

(4) That copies of the court's opinions and Permanent Injunction, together with a notice specifically articulated in the Permanent Injunction, be provided to groups organized for parental participation in school affairs at each DeKalb County public school. (*Id.* at 12–13.)

(5) That during the 1997–98 school year, Defendants conduct an in-service training session for faculty and administrators in DeKalb County public schools that is "reasonably designed to familiarize these school officials with the provisions of this Permanent Injunction, the general contours of Establishment Clause and Free Exercise principles as the court has explained them in its opinions in this case, their rights and duties in connection with the controlling law of church and state relations in the public-school setting, and the general issue of school officials' tolerance for diversity in religious opinion and duty of neutrality in matters of religion when acting in their official capacities." (*Id.* at 13.)

(6) That Defendants direct all new faculty and administrators not present for the 1997–98 in-service training to acknowledge in writing that they have read the curricular/teaching materials used at the 1997–98 in-service session. (*Id.*)

(7) That the curricular material used for the in-service be the court's opinions in this matter, together with a "program of religiously neutral, nonsectarian content selected by the DeKalb County School Board and submitted to the court-appointed monitor [for approval], with a copy served on Plaintiffs' counsel for the purpose of tendering specific written objections...." (*Id.* at 13–14.)

(8) That counsel for the School Board certify to the court on pre-determined dates each year, "that each school within the DeKalb County school system is in compliance with this Permanent Injunction." (*Id.* at 14.)

(9) That in conjunction with Plaintiffs' counsel, a monitor be nominated for the purpose of insuring compliance with the Permanent Injunction. (*Id.* at 15–16.)

(10) That the in-service session and monitor be paid for by the DeKalb County Board of Education. (*Id.* at 16.)

These enforcement provisions are challenged "[t]o the extent that section 7 requires school officials to enforce certain provisions of section 6." (Defs.' Mem. in Supp. at 22.) Section 7(e) is specifically challenged as vague because, according to the Attorney General, directing school officials to use a "program of religiously neutral, nonsectarian content," is not sufficiently clear. (*Id.*) Nevertheless, contrary to the Attorney General's purported failure to understand the require-

ments of section 7, the DeKalb County Board of Education and its members have made it patently clear that they understand the Permanent Injunction's requirements.

In addition to the Report to the court, (examined *supra*), on December 2, 1997, Plaintiffs filed a pleading entitled "Notice Of Agreement With DeKalb County Board Of Education's Nominee As Monitor, Notice Of Agreement With DeKalb County Board Of Education's Selection Of Course Materials, And Notice Of No Objection To DeKalb County Board Of Education's Policy Regarding Distribution Of Materials By Nonschool Persons." These pleadings illustrate to the court the DeKalb School Board ability to understand the terms of the Permanent Injunction. *The court finds the Attorney General's assertion that the School Board does not understand its obligations under the Permanent Injunction curious, especially in light of the Dekalb School Board's filings.* The Attorney General would be well advised to communicate more fully with his purported client(s) before making assertions on its behalf.

### 7. Refutation of the Attorney General's Hypotheticals

The Attorney General's selective interpretation of the words and phrases in the challenged provisions of the court's Permanent Injunction is a prime example of what Plaintiffs contend to be the injection of "political divisiveness into these proceedings," (Pls.' Opp'n at 4 n. 8), and one of the "spectres intended to induce fear and horror" into the populace. (Pls.' Opp'n at 9.) The court has made patently clear in its Permanent Injunction, read reasonably and without "narrow literalism," and for that matter, in its other Orders, of which the Attorney General should have received copies, exactly what type of conduct is proscribed. The court has

also taken pains to note what is permissible under current Supreme Court and Eleventh Circuit precedent. Although clear under a reasonable and logical reading, the Attorney General has adduced hypothetical situations as a means of challenging the Permanent Injunction. In their Opposition to Defendants' Motion To Stay, Plaintiffs responded factually, legally, and with specificity, to the Attorney General's hypotheticals. The court hereby adopts the pertinent provisions of Plaintiffs' pleading presented below:

> Only by ignoring the plain language of the injunction, the teachings of this Court's March 12 opinion, and the facts as presented by the parties and found by the Court can one reach such astounding conclusions. And, only by ignoring 30–odd years of precedent can one reach the conclusion that the Attorney General is likely to succeed on appeal. As this Court pointedly noted in its November 12, 1997 Supplemental Opinion and Order, "[t]his federal district court does not judge it to be its province to adopt for Alabama" the case law of the Fifth Circuit, in the face of *Lee v. Weisman* and *Jager*, to name but two controlling cases. (*See* Supp.Op. at 42, Ex. A hereto.) Thus, the defendants' likelihood of success on appeal only exists if the Eleventh Circuit overrules *Jager*, a matter which this Court cannot prognosticate and which matter will shortly be in the hands of the only court that can preliminarily overrule or ignore it. *Jager* is now the law, and under *Jager*, the defendants have no substantial likelihood of prevailing on appeal.
>
> ...
>
> 1. Students *can* read their Bibles during study hall [31]
>
> The objection to the injunction as "vague" and "overbroad" purports to find

---

**31.** There might indeed be a situation in which a student is prohibited from reading his or her Bible during study hall, but only if that activity is "school organized" or "officially sanctioned." An individual student reading his or her Bible in study hall, without direction to do so from the teacher or a school official, is not encompassed in the terms of the injunction. Nor, by the plain terms of the injunction, is a school official proscribed from instructing a student in, *e.g.*, a Bible as Literature class to do his or her homework,

including assigned reading from the Bible. Finally, of course, the entire injunction must be read in context, not dissected to fit the Attorney General's purposes in one narrow phrase. Section 6(d) makes it clear that the Court does not contemplate enjoining the student sitting in study hall; it expressly refers to a "speaker/presenter." A "speaker/presenter" is not a student quietly reading the Bible in study hall, as common sense informs us.

that under these amorphous provisions, a student cannot read the Bible in study hall.

As the Court was at pains to make clear in its March 1997 Memorandum Opinion, a copy of which was attached to the injunction, the Establishment Clause does not reach private student expression and activity. In its injunction, the Court similarly made it clear that only "school organized" or "officially sanctioned" religious activity falls within the scope of its prohibition.[32] What is "school organized" or "officially sanctioned" religious activity? According to the Court:

> [W]hen a student advocates his or her religious beliefs in situations where the student's peers are unable to move about freely (and thereby avoid listening to speech they find disagreeable) and/or when the student's peers are unable to freely express themselves in response (because school officials are actively controlling a particular setting).[33]
>
> The Court would distinguish the above-described situations from those periods during which students are "in school" or attending a school-event but school officials exercise minimal supervisory control and students are free to move about as they please. During these latter times, e.g., in between classes or lunch (depending on the factual circumstances) the restrictions on students' free speech rights are limited; students should be able to engage in sectarian, proselytizing, religious speech as long as it is not, for reasons other than its content, disruptive (e.g., it is loud, the speaker is aggressive etc.).

And, the Court clarified, "As long as students abide by a school's generally applicable rules and regulations, students should ordinarily" be permitted to engage in a wide variety of religious expression. The Court went on to provide an "exemplary" list only, one that was "by no means intended to be a complete statement of permssible [sic] religious expression by public school students." (Mem. op. at 22–23 & nn. 16, 17.)

When the speaking student's use of the school's facilities includes commandeering a captive audience or a school setting in which the speaker's schoolmates are unable to respond in kind, speech is "officially sanctioned" because the speaker is then using the machinery of the state for conveying the religious message to the captive audience. Thus, a student who obtains the permission of the school official who is monitoring the study hall and then leads his fellow study hall participants in a public Bible reading and prayer from which the dissenting students could not leave is on different constitutional ground than a student who whiles away the hour by silently reading Proverbs, instead of *Sassy* magazine, after completing his or her math assignment. The latter is engaging in that type of private religious activity which falls outside the reach of the Establishment Clause, while the former is not. The latter's conduct is not touched by the injunction, while the former's is prohibited.

This portion of the injunction is in keeping with the requirements of the First Amendment. Public school officials are prohibited by the Establishment Clause of the First Amendment to the United States Constitution from authorizing *anyone* —including students—to insert religious exercises into a *school* program. *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Jager v. Douglas County Board of Education*, 862 F.2d 824 (11th Cir.), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989); *Karen B. v. Treen*, 653 F.2d 897 (5th Cir.1981), *aff'd per curiam*, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982). This law is nothing new, and it militates against granting a stay.

---

**32.** In fact, the Court even emphasized, through the use of italics, that the phrase "religious activity" is to be modified by the phrases "school organized" and "officially sanctioned." (Injunction at 3.)

**33.** Self-evidently, a student privately reading a Bible in study hall does not necessitate a "response" from anyone.

### 2. Students *are* permitted to discuss the meaning of Christmas and Easter

As already noted, the Court's order reaches only "school organized" or "school sponsored" religious activity, so a student's discussions with his or her friends over lunch or on the playground are not affected in any way by the injunction. As for in-classroom activity, the Court has made provision for those students who might wish to give a speech or presentation that includes their personal religious beliefs, including the meaning of Christmas. In paragraph 6(a), the Court states: "This PERMANENT INJUNCTION DOES NOT proscribe students' voluntary expression of their own religious beliefs in the form of homework or artwork or other school assignments as applicable...." (Injunction at 4 (emphasis in original).) This certainly includes a discussion of "What Christmas means to me" or "The true meaning of Easter" offered in connection with a school assignment (such as an essay or a speech). A student may choose in such an academic context to proffer ideas expressive of his or her own religious beliefs, consistent with *Schempp* and with this Court's injunction.

Likewise, contrary to the Attorney General's hyperbolic fulminations, the injunction does not prohibit a history student's in-class remarks about "why Jesus contributed more than Einstein or Edison." (Mot. Partial Stay at 5.) Assuming that such a remark is an expression of religious belief,[34] such remarks clearly fall within the above-articulated exception—the "voluntary expression of [students'] own religious beliefs in the form of ... school assignments." (Injunction at 4.)[35] If a teacher directs students to discuss the importance of various historical figures, a student's voluntary discussion of the importance of Jesus fulfills the terms of the assignment. This does not violate the terms of the injunction, does not violate the Constitution, and is not a reason to grant the motion to stay.

### 3. Students *can* pray before lunch

 The injunction does not reach private expressions of a student's faith, such as saying grace before meals. One particular pre-lunch "religious" behavior is prohibited: the "religiously based" harassment of Plaintiff Jesse Chandler by his fellow students at Fyffe School. (Injunction at 11.) According to the uncontroverted testimony of Michael Chandler in this case:

> Fyffe School students are led to lunch every day and cannot leave the campus for lunch; the school has a closed-campus policy. In approximately October 1996, Jesse[36] began experiencing harassment in the lunchroom. I am aware that the agreement signed by my lawyer and DeKalb's lawyers states that school officials will intercede to stop harassment based on religious belief. Virtually every day between October 1996 and April 1997, approximately 175 out of 200 students in the lunchroom

---

**34.** It might be or it might not be. It is certainly possible that a student could believe that Jesus Christ is an important historical figure without believing that he is the Son of God, and presumably a great many Jewish believers, Muslims, Buddhists and agnostics could believe this. It could be, for example, that a Muslim student or even an atheist student could believe that Jesus was a great *teacher* without believing in or expressing a belief in Jesus' divinity. It could be that a person of any religion or no religion could forcibly argue in the context of an academic assignment that measuring a calendar from the date of a crucifixion is *prima facie* evidence that the historical importance of Jesus outweighs that of the inventor of incandescent lighting. This speech would not necessarily be religious, and even if it were, it is not proscribed. The matter is neither here nor there, except to the extent it is in the Attorney General's head and his brief.

**35.** Also, to the extent that "educational texts" were involved in this hypothetical history class, those texts can be specifically religious, as long as the books or documents are part of an objective or academic course of study. (Injunction at 3.) *See Schempp*, 374 U.S. at 225 ("It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as a part of a secular program of education, may not be effected consistently with the First Amendment.").

**36.** Jesse Chandler, the minor-child plaintiff and son of Michael Chandler.

stood up and prayed aloud when Jesse entered the lunchroom. On one or more occasions, a student would announce on Jesse's arrival, 'One, two, three, pray.' I discussed this situation about two weeks after it started happening with principal Danny Ashley, who admitted to me that this was occurring in systematic fashion. I also complained to Superintendent Parrish. Both Ashley and Parrish told me that lunch time was noninstructional and students could do whatever they want. I do not challenge the right of small groups of students or individual students to pray nondisruptively at lunchtime. However, a mass, audible prayer offered specifically because my son has entered the lunchroom is in my view harassment that school officials should intercede to stop, particularly in view of the captive-audience problem. DeKalb County agreed that its school officials would intercede to stop harassment based on religion and has not done so despite my requests and the requests of my counsel.

... I do not want my son harassed every day in this way and for school officials to shirk their duty to stop the harassment. The students' behavior has been organized and vindictive. In April, I told Jesse to take his lunch to my wife Barbara Chandler's classroom and to eat his lunch there to escape the harassment. I did so around the time that Jesse told me that the students were going to offer a Bible reading at lunch because they had heard I was going to be on campus that day. Technically, what I told my son to do is a violation of school policy, because he is supposed to be in the lunchroom during the lunch period. However, I felt that I must do something to prevent his being further stigmatized based on this lawsuit.

(Supp.Op. and Order at 21–22.). The Defendants, including Defendant Weldon Parrish, and DeKalb County official Danny Ashley, did not submit contrary testimony.

Moreover, this Court specifically stated that students at lunchtime, depending on the factual circumstances, "should be able to engage in sectarian, proselytizing, religious speech as long as it is not, for rea-

sons other than content, disruptive (e.g., it is loud, the speaker is aggressive, etc.)." (Mem.Op. at 22 n. 16.) 175 students ganging up on Jesse Chandler, if this is in fact "sectarian, proselytizing, religious speech," is also disruptive and aggressive. This Court's proscription of that specific conduct does not extend to banning a student's saying of grace generally.

4. Students *can* distribute flyers about "youth group" activities to their fellow students

As is made absolutely clear in the injunction, students are NOT prohibited from "distributing religious materials to classmates during noninstructional time, subject to the same time, place, and manner restrictions imposed on student distributions of nonreligious materials ..." (Inj. at 4, 11.) In keeping with the policy of neutrality, students' distributions of tracts or invitations to church events are treated exactly like the distributions of non-religious materials and are subject to the school's time, place and manner restrictions. The First Amendment does not require anything more. This false objection is not a reason to grant the Attorney General's motion to stay.

5. A valedictorian *is not* prohibited from explaining the importance of Mother Teresa to her success in school

▉ In the hypothetical offered by the Attorney General, a class valedictorian could not explain the importance to her of Mother Teresa in her speech to the graduating class. (Mot. Partial Stay at 2.) The Attorney General complains that such a speech might be deemed a "devotional" and that school officials would be obligated to censor her speech before she gave it in order to prevent an infraction of the terms of the injunction.

The Attorney General has made a profound analytical error. Just as he assumes that all discussion or reference to Jesus is necessarily religious or proselytizing speech, he assumes that any discussion of Mother Teresa, merely because she is a religious figure, would be religious or have the purpose or effect of proselytizing. It is possible that, just as Jewish believers,

Muslims and agnostics could believe that Jesus has been a shaping force in history without believing that he is the Son of God, persons could believe that Mother Teresa was a great helper of the poor without subscribing to her religious faith or religious example. Thus, speech about Mother Teresa is not necessarily religious speech.

Such a speech as the Attorney General contemplates is not a "devotional." The court's injunction is not issued in a vacuum; it is issued in the factual context of DeKalb County. In DeKalb County, devotionals were expressly delivered over the public-address system, as all of the affidavits from employees at the Plainview School establish. They included Bible reading and prayers, and the DeKalb County affiants testified that the messages over the intercom were of "a devotional character, ... but not religious" even while admitting that they included Bible readings and prayer. (*See* Mem .Op. and Order, Nov. 12, 1997, at 10–12 (granting summary judgment to plaintiffs against DeKalb County on nonracial challenges).) The Court made plain that it took a devotional to be religious. (*Id.* at 11.) The Court's injunction clearly contemplates that a devotional may is [sic] religious: "vocal prayer; Bible and religious devotional or scriptural readings" are proscribed by Section 6(a); prayer and "religious or devotional messages (including scriptural readings)" over the public-address system are proscribed by section 6(c); "Biblical and scriptural readings" at school-sponsored assemblies and events except where consistent with the Equal Access Act, are proscribed by Section 6(d). The Attorney General may not pry one nubbin from the Court's injunction and pretend that it stands alone, without the context of the rest of the injunction and the factual context in which the injunction was rendered.

From a 40–page opinion on the facial validity of the statute in March 1997, over 50 pages of findings of fact and conclusions of law on November 12, 1997, a 24–page summary judgment opinion on November 12, 1997 which the Court stated was to be read concurrently with the findings of fact [37]—DeKalb County ought to know what is proscribed. *It does not matter if the other defendants who are not specifically enjoined as to DeKalb County practices understand the injunction or not.* An entire valediction on Mother Teresa is not proscribed; a prayer is. It is unimportant that the Attorney General purports not to know what a devotional is; it matters only that DeKalb County, which is bound by the provisions of the injunction,[38] knows what a devotional is. In this case, devotionals have, by all the facts, consisted of prayer and Bible reading. Nowhere in the Complaint is Mother Teresa mentioned, nor have the DeKalb County defendants purported to offer testimony about Mother Teresa. Instead, as the Court noted in its November 12, 1997 summary judgment opinion, the DeKalb County defendants sought refuge as to their "devotionals" and "words of inspiration"—which by their own affidavits turn out to be Bible readings and prayer over the intercom—in the statute's protection, themselves denominating such devotionals "non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions." (*See* Mem.Op., Nov. 12, 1997 at 10–11.)

Noting that the DeKalb County defendants had equated "words of inspiration" with "devotionals" in response to an interrogatory inquiring about a Bible reading at a D.A.R.E. assembly, and averring that the activity was alleged to be 'non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions' *by DeKalb County,* the Court expressly stated: "The court finds it reasonable to conclude that mere 'words of inspiration' would not require the invocation of the Alabama school-prayer statute and that DeKalb conflated such a category of inspirational words into the category of devotions in hopes of thereby insulating them from scrutiny." *The specific invocation of the statute would not be necessary for secular 'words of inspiration'.....* (Mem.Op., Nov. 12, 1997, at 11.) (Emphasis added.)

---

37. *See* Supp.Op. and Order, Nov. 12, 1997 n. 53. 38. [Not adopted].

In other words, *secular words of inspiration—as distinct from prayers and Bible readings*—are not prohibited by anything in the Court's injunction or in its opinions. *Secular presentations, including presentations drawing upon the examples of adults who have led righteous lives, are absolutely permissible.*[39]

Other federal courts agree with this court about what is proscribed activity, equating "devotional" with "prayer" and/or "Bible reading." *See Schempp*, 374 U.S. at 207 (student-chosen Bible readings followed by Lord's Prayer); *Wallace v. Jaffree*, at 42 (noting complaint's equivalence of "devotional" activities with "saying prayers in unison"); *Dayton Christian Schools, Inc. v. Ohio Civil Rights Comm'n*, 766 F.2d 932, 937 (6th Cir.1985) ("devotional thought" is "something fresh to me from the Scriptures"); *EEOC v. Townley Engineering & Manufacturing Co.*, 859 F.2d 610, 612 (9th Cir.1988) (devotional services included "prayer, thanks to God, testimony and scripture reading"); *Bell v. Little Axe Sch. Dist.*, 766 F.2d 1391, 1397 n. 2 (10th Cir.1985) (devotional exercises also called "fellowship, prayer sessions, prayer meetings, religious sessions, religious meetings, 'sharing sessions,' and 'Prayer Service/Activity' "); *Doe v. Stegall*, 653 F.2d 180 (5th Cir. Unit A 1981) (devotional activities were "poetry, Bible verses and prayers of a Protestant cast"); *Meltzer v. Board of Pub. Instr.*, 548 F.2d 559, 573 (5th Cir. 1977) (en banc), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979) (devotionals consisted of "prayer and Bible reading"); *Alabama Civil Liberties Union v. Wallace*, 331 F.Supp. 966, 969 (M.D.Ala. 1971) (Judge Varner finding that Bible readings are devotionals), *aff'd per curiam*, 456 F.2d 1069 (5th Cir.1972); *Herdahl v.*

*Pontotoc County School Dist.*, 933 F.Supp. 582, 585 (N.D.Miss.1996) (devotionals were short inspirational messages often including Bible reading, frequently followed by a prayer).

This case was not litigated in the dark for going on two years. The record in this case reveals what a devotional is, and in this case, devotionals look a lot like the unconstitutional activity in the above-cited cases, especially *Herdahl*. Devotionals are religious, not secular words of inspiration. DeKalb County can understand this.

The Attorney General apparently is confused by the Court's specific reference to using a "Historian's Address" as a ruse for graduation prayer—which the evidence in this case shows occurred—and has appended a prayer in the guise of a class "Historian's Address" that actually occurred to his general speculation about references to history or historical figures that have not occurred. This is not a reasonable reading, and it disregards the record.

This is the mataphorical [sic] apples and oranges dumped out of the cart into reason's path, hoping to trip it. It is clear from the Court's injunction that offering speech about historical figures, including religious ones, is permissible, and it is not permissible to offer *prayer* in the guise of a "Historian Address," as Sylvania High School did in 1996 and 1997 while this lawsuit was pending, the 1997 prayer occurring after plaintiffs' counsel had expressed objection to DeKalb County counsel. It is to this pointed "Historian Address" experience, not to Mother Teresa, that a particular provision for this contingency is made in the Court's injunction.

In short, the issue is not, as the Attorney General argues, whether students have free speech rights to expound on the topic

---

**39.** A "devotional" camouflaged by an "inspirational" patina is clearly what the Court had in mind, *with reference to the facts in DeKalb County, which it exhaustively detailed*, when it referred in Section 6(a) to discussions of a devotional/inspirational nature in "the classroom and in instructional settings," as distinct from graduation. It did not repeat this phrase with regard to graduation prayer. Why? Because the facts before the Court did not disclose with regard to graduation prayer, as they did with regard to prayer and devotionals over the intercom system during the instructional day, that "words of inspiration" were actually Bible readings or prayers. Thus, the Court has no reason, in regard to graduation, to say anything other than what it implicitly said in its November 12, 1997 summary judgment opinion: that secular words of inspiration are permissible in that context. At graduation, the evidence being what it was, DeKalb County is enjoined from offering devotional messages, not from offering any secular inspirational message.

of their choice in a graduation speech. The issue is whether school officials have authorized someone—anyone, student or not [40]—to insert religious exercises into the school's graduation program.

This Court, like other federal courts before it, apprehends a "devotional" to be susceptible of its common meaning.[41] Its findings of fact and summary judgment opinion bear this out:

> [I]n Interrogatory Number 11, the Plaintiffs ask: "In paragraph 50 of the DeKalb defendants' Response to Plaintiffs'· Statement of Stipulated Facts, the defendants state, 'Defendants admit that student-led devotionals have taken place at Plainview School.' Do the DeKalb defendants contend in this lawsuit that such prayers offered by student 'volunteers' are 'non-sectarian, non-proselytizing, student-initiated voluntary prayer, invocations, and/or benedictions'?" DeKalb responded, "Yes."
>
> Since all of the parties, as well as the Court, appear to be of the opinion that a 'devotional' is a religious exercise, that falls within the category of 'prayer, invocations and/or· benedictions,' and the Court finds that for the same reasons it has found that under established United States Supreme Court precedent that vocal prayers led by students in the classroom are unconstitutional, student-led 'devotionals' are similarly unconstitutional.

(Supp.Op. at 58 & n. 52) (*citing Engel, Schempp, and Lee*).

6. School officials *are not* required to be censors or to be clairvoyant at commencement or at student assemblies and events

The injunction contemplates that there will be no prayer, benediction, invocation or devotional at commencement exercises. The injunction contemplates that no student will offer one. *See* Section 6(b). However, the injunction does not contemplate censorship by school officials; if it did, it would not call for school officials to take appropriate disciplinary action as they would for any violation of school disciplinary rules that is calculated to cause cessation of the conduct *as it occurs* and deterrence of such conduct in the future.

The same is true of student assemblies and sporting events. The injunction contemplates that there will be no prayer, scriptural readings, or devotional messages over the public-address system during the school day or at school-sponsored assemblies or events. However, the injunction does not contemplate censorship or prior restraint by school officials; if it did, it would not call for school officials to take appropriate disciplinary action as they would for any· violation of school disciplinary rules that is calculated to cause cessation of the conduct as it occurs and deterrence of such conduct in the future.

This argument is simply a shibboleth. It is clear what the Court meant to prohibit, and it is clear that school officials—who have sat through a great many prayers in DeKalb County classrooms, as well as at football games, assemblies, and commencement exercises—know prayer when they see it.

7. A parent *can* pray for an injured player while the parent is seated in the stands

The Plaintiffs have looked in vain for a portion of the injunction that would prohibit such prayers, as the Attorney General alleges. It is difficult to see how a parent

---

40. Including Muhammad Ali. (Mot. Partial Stay at 2.)

41. *See Random House College Dictionary* (rev. ed.1982). A "devotion" is defined as: "1. profound dedication; consecration. 2. earnest attachment to any purpose, cause, etc. 3. an assignment or appropriation to any purpose, cause, etc. 4. *Theol.*, the ready will to serve God. 5. Often, *devotions. Eccles.* religious observance or worship; a form of prayer or worship for special use." .A "devotional" is defined as: "1. characterized by devotion; used in devotions. 2. Often, *devotionals.* a short religious service, esp. as part of a meeting, convocation, or the like." Any commonsense reading of the injunction here, informed by the evidence in this case, will indicate exactly what is meant by "devotions" and "devotionals." We are not talking about setting aside land or materials or an earnest attachment to the school principal.

who prays while seated in the stands, whether out loud or silently, would ever fall within the category of prohibited "school organized" or "officially sanctioned" prayers over the public address system at sporting events. (Injunction at 6–7). [sic] It is also difficult to see how a school official could either prevent or permit a parent from praying in the stands and so run afoul of the injunction.

The Attorney General's similar ... claim that a student cannot bow his head in prayer after scoring the winning touchdown is likewise not the reading of a reasonable person. Although Section 6(d) does not expressly provide that he can, Section 6(c) is the provision that is applicable to prayer over the public-address system at high school football games. The Attorney General's hypothetical does not feature the football player seizing the public-address system and commandeering the audience, which would be proscribed under Section 6(c).[42] These examples indicate the way in which the Attorney General has seized on one little snippet of the injunction in order to sound the alarm bell without reading particular provisions in context or with regard to the facts or the totality of circumstances.

8. Student Bible Clubs *can* meet on the same terms as other student clubs

According to the Attorney General, the injunction would prohibit a student-initiated Bible Club from meeting on campus, even after school hours, and would prohibit students from publicizing the times and locations of such meetings. (Mot. Part. Stay at 6–8.) only through a tortured reading of the injunction could one arrive at such a conclusion, and the law does not require courts or parties to twist themselves into knots trying to find an unconstitutional meaning in an otherwise plain directive.

The provision of the injunction which the Attorney General finds offensive reads:

This PERMANENT INJUNCTION DOES NOT affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent with the federal

Equal Access Act, 20 U.S.C. § 4071 et seq., or to quietly engage in religious activity during noninstructional times, so long as it does not unduly call attention thereto and so long as it does not interfere with the rights of other students to freely pass thereby or to avoid its imposition upon themselves. This PERMANENT INJUNCTION DOES NOT prohibit students from distributing religious material to classmates during noninstructional time, subject to the same time, place and manner restrictions imposed on student distributions of nonreligious materials....

(Inj. at 4.)

Manifestly, the injunction "does not affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent with the federal Equal Access Act." (Inj. at 4.) The religious activity permitted by the federal Equal Access Act—the use of school facilities by student-initiated noncurricular Bible clubs on the same basis as other noncurricular clubs—is expressly protected. *See Westside Comm. Schl. v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). The injunction also allows "students" (and there is nothing in the injunction which excludes members of the Bible Club from the general category of "students") to distribute "religious materials" to their classmates, on the same terms that nonreligious materials are distributed. Later, the Court clarified the rights of student Bible club members to have access to the public address system to publicize their meetings:

This PERMANENT INJUNCTION DOES NOT prohibit students from making announcements over the school public-address system regarding meetings of noncurricular religious clubs, ... provided that any such announcements are subject to the same time, place and manner restrictions that apply to announcement of nonreligious activities.

(Injunction at 7.)

As acknowledged by the Attorney General, this is precisely what federal law requires. (*See* Mot. Partial Stay at 8 ("offi-

42. [Not-adopted].

cial recognition allows student clubs to be part of the student program and carries with it access to the school newspapers, bulletin boards, the public address system and the annual Club Fair") (*quoting Mergens* ).) The combination of the two clauses should solve the Attorney General's problem with the injunction and end disputes about the rights of Bible Club members. The plaintiffs do not see how the Court could have been less vague or more narrow.

Still, the Attorney General insists that the injunction is overbroad because it makes it clear that in addition to these other rights, students may also "quietly engage in religious activity during noninstructional times, so long as it does not unduly call attention thereto and so long as it does not interfere with the rights of other students to freely pass thereby or to avoid its imposition upon themselves." [43] (Injunction at 4.) A reasonable person would not glean from the injunction that this additional right to pursue the religious activities of the student's choice during noninstructional times interferes with the student's separate, Equal Access Act-guaranteed right to participate in a religious club on the same basis as he might in nonreligious clubs.

(*See* Pls.' Opp'n at 10–32.)

## II. Conclusion

Based on the foregoing, the court finds that those enjoined understand their obligations and responsibilities under the Permanent Injunction. **It is also clear that contrary to the Attorney General's strained hypotheticals, the Permanent Injunction does nothing to limit individual exercise of personal religious beliefs. The court has answered most, if not all of the Attorney General's proffered hypotheticals *in favor of the activity the Attorney General claims is prohibited.* As articulated throughout this Order, the activities the Attorney General claims are prohibited, simply put, *are not.***

Those attempting good-faith compliance with the court's Orders need not fear contempt citations. However, the court expects compliance with its Permanent Injunction unless and until it is further clarified by the Eleventh Circuit Court of Appeals or the United States Supreme Court. Counsel, in particular, are directed to make every effort to explain to their clients, in building block fashion if necessary, the exact nature and scope of the Permanent Injunction, and to endeavor to quell misunderstandings or misrepresentations, whether genuine or feigned, the latter of which appear to be running rampant.[44]

The political posturing that has followed this case encourages divisiveness and apprehension, benefits neither the citizens nor the school-children of Alabama, and clouds the real issues raised by this suit: the coercive religious practices engaged in or allowed by state officials in DeKalb County. In con-

---

**43.** The Court used the word "or," to indicate another item in the list of protected student activities.

**44.** The court notes the December 8, 1997 issuance of a memorandum by the Attorney General and the State Superintendent of Education regarding "Permissible Activities in the light of *Chandler v. James.*" The court commends any *good-faith* effort to "clear up any misunderstandings" and "provide assistance to public school administrators and teachers." (*See* December 8, 1997 Mem., Attach. C; *see also,* Pls.' Add. Evid.) This memorandum was issued in conjunction with the Attorney General's December 8, 1997 Press Release. (*See* AG December 8, 1997 Press Release, Attach. B; *see also,* Pls.' Add. Evid.) Both documents attempt to articulate guidelines regarding permissible and impermissible conduct. Because the question of the propriety of the Attorney General and Superintendent's guidelines is not before the court, the court will not examine the issued guidelines in light of any of its previous Orders at this time.

Interestingly, however, although the Attorney General purports to have derived these guidelines exclusively from "previous opinions issued by the U.S. Supreme Court and the Eleventh Circuit Court of Appeals, rather than the *Chandler* ruling in October by a U.S. District Court in Montgomery," (AG December 8, 1997 Press Release at 1; *see also* Pls.' Add. Evid.), the guidelines track this court's Permanent Injunction and March and November 1997 Orders, as well as the cases relied on by this court in issuing those Orders. It is indeed odd that the Attorney General now cites those cases for support when they were conveniently ignored prior to the court's March 1997 Memorandum Opinion and Order. Nevertheless, the court commends any truthful dissemination of information regarding the issue of religion in the public schools.

formance with long established precedent, which this court is bound to follow and which the Attorney General now appears to recognize as controlling, the Permanent Injunction simply proscribes state-established religion and endeavors to ensure the state's neutrality in matters of religion in the public schools. An informed understanding of the Permanent Injunction discloses nothing more.

### ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendants' Motion For Partial Stay Of Permanent Injunction be and the same is hereby GRANTED IN PART and DENIED IN PART. Defendants' Motion is GRANTED as to the twelve words in section 6(a) of the court's three-thousand, seven-hundred and fourteen word Permanent Injunction reading "quietly" and "so long as it does not unduly call attention thereto and."[45] (*See* Permanent Inj. at 4, lines 14–16.) Otherwise, Defendants' Motion For Partial Stay Of Permanent Injunction is DENIED. All other provisions of the October 29, 1997 Permanent Injunction shall remain in full force and effect absent modification by the Eleventh Circuit Court of Appeals or the United States Supreme Court. The Parties are DIRECTED to fully comply with the terms of the Permanent Injunction, absent the portion of section 6(a) STAYED above, as applicable.

---

**45.** Paragraph 5 of section 6(a) of the Permanent Injunction, with those portions stayed, should read:

> This PERMANENT INJUNCTION DOES NOT affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent with the federal Equal Access Act, 20 U.S.C. Section 4071, *et seq.*, or to ... engage in religious activity during noninstructional times, ... *so long as it does not interfere with the rights of other students to freely pass thereby or to avoid its imposition upon themselves.* This PERMANENT INJUNCTION DOES NOT prohibit students from distributing religious materials to classmates during noninstructional time, subject to the same time, place, and manner restrictions imposed on student distributions of nonreligious materials, subject to the provisions of paragraph 6(e) below.